

FILED

NOV 2 4 2021

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF ) | |
| THE UNITED STATES OF AMERICA FOR AN ) | **JUDGE VARLAN** |
| ORDER AUTHORIZING THE ORIGINAL ) | **(UNDER SEAL)** |
| INTERCEPTION OF WIRE AND ELECTRONIC ) | |
| COMMUNICATIONS TO AND FROM ) | |
| CELLULAR TELEPHONE (865) 282-1753 ) | Misc. No. _5012_ |
| IMEI: 352847113059380 ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION

### I.    INTRODUCTION

Task Force Officer Jeremiah S. Johnson, being duly sworn, deposes and states the

following:

1.      I am a Task Force Officer (TFO) with the Drug Enforcement Administration

(DEA), United States Department of Justice.  I have been a TFO with the DEA since April 2009,

and I am presently assigned to the Knoxville District Office (KDO).  I am also employed by the

Knox County Sheriff's Office (KCSO) and have been so employed since October 2005.  Initially

I worked as a corrections officer with the KCSO.  In July 2007, prior to my assignment as a

TFO, I was assigned to the narcotics division of the KCSO.  I participated in numerous narcotics

investigations, initially assisting with surveillance and working with electronics such as body

wires and computers used to assist in investigations.  In August 2008, I attended the KCSO

Regional Training Academy and became a certified patrol officer, remaining in the narcotics

division.  I am a law enforcement officer of the United States within the meaning of Title 18,

United States Code, Section 2510(7), and I am empowered by law to conduct investigations and

to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

**Exhibit 2**

2. I am currently assigned to the DEA KDO. My experience includes, but is not limited to, conducting physical surveillance, interviewing witnesses, writing affidavits for and executing search warrants, working with undercover agents and informants, issuing administrative and federal grand jury subpoenas, and analyzing financial records, telephone records, and data derived from the use of pen registers, trap and traces, and wiretaps, and assisting in wiretap investigations.

3. I have received training and am experienced in the investigations of violations of the federal drug and money laundering laws. As a result, I am familiar with matters including but not limited to, the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs and to hide profits generated from those transactions. I also have experience in analyzing and interpreting coded dialogue and communication used by drug traffickers.

4. I know, based upon my training and experience, as well as information relayed to me during the course of my official duties, that members of DTOs routinely utilize wire and electronic communications facilities, including cellular telephones, push-to-talk two-way radios, public telephones, and other electronic devices to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members. During the course of these communications, organization members routinely utilized coded references concerning their illegal activities in an effort to avoid detection by law enforcement. I know, based upon my training and experience, that the communication of time-sensitive information is critical to the success of an organization's illegal activities. The critical nature of this information stems from the necessity of the organization's management to provide direction for the importation, storage, transportation, and distribution of narcotics, as well as the

subsequent laundering of the proceeds of these illegal activities. Finally, I also know that narcotics traffickers routinely use prepaid telephones requiring no subscriber information, and often use fictitious names or the names of other individuals to register telephones, vehicles, real property, and utility services in order to avoid detection by law enforcement.

5. Based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transaction, attempt to conceal, disguise or legitimize unlawful proceeds through domestic and international banks and their attendant services, securities brokers, professionals, such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellular telephones both via voice and text message to communicate with co-conspirators in furtherance of their money laundering activities.

6. At the present time, I am participating in an investigation of a cocaine trafficking organization, which operates in Tennessee, Puerto Rico, and elsewhere. The case is being investigated by the DEA, the Knox County Sheriff's Office ("KCSO"), the United States Postal Inspection Service ("USPIS"), and other federal, state, and local law enforcement agencies. Information contained within this affidavit is based upon my personal knowledge and participation in this investigation, and upon information I believe to be reliable from the following sources:

a) Oral and written reports and documents about this and other investigations that I have received from members of DEA, KCSO, USPIS, and other federal, state, and local law enforcement agencies;

b) Physical and electronic surveillance conducted by DEA, KCSO and other federal, state, and local law enforcement agencies that has been reported to me either directly or indirectly;

c) Confidential sources;

d) Public records;

e) Subpoenaed information from FedEx;

f) A review of pen register information, telephone toll records, caller identification information and subscriber information;

g) Consensually recorded calls and texts; and

h) Previously intercepted calls and texts.

7.     Because this Affidavit is being submitted for the limited purpose of securing authorization for the interception of the requested wire and electronic communications, I have not included each and every fact known to me concerning the underlying investigation.  I have set forth only the facts that I believe are essential to establish probable cause for an Order authorizing the interception and recording of wire and electronic communications described in this Affidavit.

8.     This Affidavit is made in support of an application for an order, pursuant to 18 U.S.C. § 2518, authorizing the original interception of wire and electronic communications, including any voicemail messages intercepted as they are left or retrieved, occurring to and from a cellular telephone assigned telephone number (865) 282-1753, International Mobile Equipment

Identity ("IMEI") Number 352847113059380 ("Target Telephone 5"), for a 30-day period measured from the day in which investigative or law enforcement officers first begin to conduct interceptions over Target Telephone 5 under this Order, or ten (10) days from the date this Order is entered, whichever is earlier.

9.      Based on this investigation, I believe that Target Telephone 5 is being used, and will continue to be used, to facilitate drug trafficking crimes in the Eastern District of Tennessee, and elsewhere.  Intercepted communications will first be heard or read and minimized at the DEA office in Knoxville, Tennessee.

10.      Records received from T-Mobile indicate that Target Telephone 5 is subscribed to "Oscar Cruz Rameriez" at 2404 Capri Drive, Knoxville, Tennessee 37912.  It is known that Oscar CRUZ RAMIREZ ("O. CRUZ") is the user of Target Telephone 5.  Based on T-Mobile records, Target Telephone 5 was activated on December 26, 2020.  The authorization given is intended to apply to the target telephone number listed above, and also to any other telephone number subsequently assigned to an instrument bearing the IMEI number used by Target Telephone 5, and to any other IMEI number to which Target Telephone 5 is assigned, within the thirty-day period.  The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of Target Telephone 5 while the telephone is off the hook or otherwise in use.  In this instance, Target Telephone 5, number (865) 282-1753, is the current telephone number being used; however, it is common for individuals involved in the illegal narcotic trafficking trade to change cellular telephone devices and/or to change telephone numbers in an attempt to evade law enforcement investigations.  As reflected in this affidavit, Target Telephone 5 is being used and possessed by O. CRUZ, with service through T-Mobile.

11.     This affidavit is based on my personal knowledge and participation in this investigation, as well as through interviews and analysis of reports, both written and verbal, provided by other federal, state, and local law enforcement officers and employees during the course of their official duties and through the analysis of telephone toll information and other information within the investigation. On the basis of my personal participation, knowledge of and familiarity with this investigation, and on the basis of other information, which I have reviewed and determined to be reliable, I allege that:

a)     There is probable cause to believe that OSCAR CRUZ RAMIREZ ("O. CRUZ"), GUSTAVO CRUZ RAMIREZ ("G. CRUZ"), DOLORES CRUZ ("D. CRUZ"), JORGE CARDOZA ("CARDOZA"), IVAN DAVID ANDUJAR ("ANDUJAR"), MARCOS MARCANO ROMAN ("MARCANO ROMAN"), RONNIE EUGENE CAMPBELL JR. ("CAMPBELL"), VICTOR INESTROZA ("INESTROZA"), RICHARD LANXTER ("LANXTER"), TREVOR WARREN ("WARREN"), RHONDA HOLLOWAY ("HOLLOWAY"), JOAQUIN GREENLEE TOWNS ("TOWNS"), DARWIN ALEJANDRO RODRIGUEZ ("RODRIGUEZ"), JUAN CARLOS ROMAN ("ROMAN"), EDWIN GUTIERREZ ("GUTIERREZ"), STEVEN WHITE ("WHITE"), Unknown Male 8197 ("UM-8197"), Unknown Male 2349 ("UM-2349"), Unknown Male 8672 ("UM-8672"), Unknown Male 7381 ("UM-7381"), Guadalupe ALVA ("ALVA") and others as yet unknown or unidentified (hereinafter referred to as "Target Subjects"), have committed, are committing, and will continue to commit, offenses enumerated in Title 18 Unites States Code, Section 2516, that is, offenses involving violation of:

i.     Distributing and possessing with intent to distribute cocaine, and the conspiracy to distribute and to possess with intent to distribute cocaine, a Schedule II

controlled substance, and marijuana,[1] a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841 and 846.

        ii.      Use of a communications facility to commit, cause and facilitate drug trafficking activity, in violation of Title 21, United States Code, Section 843(b);

        iii.     Maintaining a place for manufacture, distribution, or use of controlled substances, in violation of Title 21, United States Code, Section 856;

        iv.     Conducting or attempting to conduct financial transactions with the proceeds of a specified unlawful activity with the intent to promote the specified unlawful activity or to conceal or disguise the proceeds; and the conspiracy to conduct or to attempt to conduct such financial transactions, in violation of Title 18, United States Code, Section 1956(a)(1) and 1956(h);

        v.      Carrying a firearm during and in relation to a drug trafficking crime, or use of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and

        vi.     Aiding, abetting, counseling, commanding, inducing or procuring the commission of any of the above offenses against the United States, in violation of Title 18, United States Code, Section 2(a).[2]

    b)     There is probable cause to believe that particular wire and electronic communications of O. CRUZ, G. CRUZ, D. CRUZ, CARDOZA, and others yet unknown (hereinafter, the "Target Interceptees"), concerning the above-described federal felony offenses

---

[1]     While there is no mention of marijuana in this affidavit, there is a discussion regarding distribution quantities of marijuana in the affidavit for Target Telephone 2, and incorporated herein.
[2] Although aiding and abetting under 18 U.S.C. § 2 is not a predicate offense for Title III interception enumerated in 18 U.S.C. § 2516, there also is probable cause to believe that the Target Subjects of the investigation have aided and abetted and are aiding and abetting the substantive offenses listed.

will be obtained through the interception of such communications over Target Telephone 5. In particular, these communications are expected to reveal evidence of the above federal felony offenses committed by the targets of the investigations and the dates, times, and places of the commission of the aforementioned federal felony offenses of the individuals identified above, along with their suppliers, co-conspirators, aiders, abettors, and other participants in the conspiracy, thereby identifying the suppliers, coconspirators, aiders, and abettors and others yet unknown, as well as their places of operation, distribution of contraband and money involved in the illegal activity and the location of the resources used to finance the illegal activity. Among other things, these wire and electronic communications will provide the identities and roles of participants in the illegal controlled substance distribution and trafficking organization; the manner in which this illegal controlled substance distribution organization operates; the identification of the illegal conduct; the identification of the nature and methods of the managing and financing of the controlled substance distribution organization; the locations of any controlled substance stash and controlled substance warehouses; the suppliers of the controlled substance; the identification and location of future controlled substance transactions; the identification of controlled substance distribution methods; the identification and location of evidence of controlled substance transactions, financial records and other records reflecting the occurrence of controlled substance transactions, and monies being used to finance and conduct the controlled substance transactions; and the identification of other individuals not yet identified who are participating in, directing, or deriving financial profit and benefit from the illegal controlled substance distribution business; and the identity of which telephone, telephones, and/or other communication device or devices, if any, is or are being used by the targets of this investigation and other yet unknown, to direct others in the conspiracy to distribute controlled

Case 3:21-mc-05012-TAV   Document 2   Filed 11/24/21   Page 8 of 79   PageID #: 31

substances. In addition, in my opinion, the wire and electronic communications are expected to constitute admissible evidence of the commission of the above-cited offenses.

        c)      Normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ, as is described herein in further detail.

        d)      There is probable cause to believe that Target Telephone 5 is being and will continue to be used in connection with the commission of the above-described offenses.

        e)      I believe intercepting Target Telephone 5 will provide evidence that will lead to the complete dismantling of the DTO.

        12.      The statements contained in this affidavit are based in part on information provided by law enforcement agents with the DEA, KCSO, USPIS, and other law enforcement agencies; on information provided by confidential sources; on other information noted herein, and on my experience and background as a Task Force Officer with the DEA. Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire and electronic communications, I have not included each and every fact known to me concerning the investigation. I have set forth only the facts I believe are necessary to establish the necessary foundation for an order authorizing the interception of wire and electronic communications. I know that persons engaged in drug trafficking maintain contact with other persons involved in such illegal activities, and that the use of telephones is essential to maintain such contact.

## II.     INVESTIGATIVE OBJECTIVES

        13.      There is probable cause to believe that particular wire and electronic communications of the Target Interceptees concerning the above offenses will be obtained

through the requested interception of wire and electronic communications for which authorization is herein sought. In particular, there is probable cause to believe that these wire and electronic communications will concern the specifics of the above offenses, including:

a) The nature, extent, and methods of operation of the illegal drug trafficking and money laundering of the Target Interceptees;

b) The nature and extent of the mechanism used by the Target Interceptees to import, transport, and distribute controlled substances within the Eastern District of Tennessee, and elsewhere;

c) The identities of co-conspirators, accomplices, aiders and abettors, and other participants operating in concert with the Target Interceptees, and their respective roles and participation in the above-mentioned offenses;

d) The identification of other communications facilities used by the Target Interceptees in furtherance of the criminal activity alleged herein;

e) The identities of the sources of supply of the controlled substances distributed by the Target Interceptees;

f) The locations where the controlled substances are stored;

g) The methods and means of payment for the controlled substances employed by the Target Interceptees, and the manner in which these transactions are conducted;

h) The dates, times, places, and manner in which controlled substances and the proceeds of drug trafficking are being delivered to the Target Interceptees;

i) The methods and means by which the Target Interceptees dispose of and invest the proceeds from the sale of controlled substances; and

j)      The location and source of resources used to finance the illegal activities described herein.

14.     In addition, these communications are expected to constitute admissible evidence of the commission of the above-described offenses. It is further expected that interception of the requested communications, if authorized, will provide valuable evidence against the perpetrators of the above-described offenses that cannot reasonably be obtained by other means. These interceptions will help meet all the above-listed goals of this investigation. Based on my training and experience, I do not believe that this DTO can be dismantled without the interception of the requested communications.

15.     The nature of this investigation is such that there is probable cause to believe that additional communications of the same type will continue to occur after the described type of communications have been first obtained.

### III.    PERSONS EXPECTED TO BE INTERCEPTED

16.     OCSAR CRUZ RAMIEREZ – O. CRUZ has a 2007 charge for Alien Removal under sections 212 and 237 of the Immigration and Nationality Act ("INA"). Based on information obtained through this investigation, agents have learned that O. CRUZ supplies and coordinates shipments of cocaine for himself and G. CRUZ. Based on intercepted communications, agents believe O. CRUZ is the main contact to coordinate these shipments of cocaine from an unknown source of supply. O. CRUZ is the user and subscriber of Target Telephone 5.

17.     GUSTAVO CRUZ RAMIREZ – G. CRUZ has a 2003 charge for 8 U.S.C. Section 1229, Removal Proceedings and was deported to Mexico. G. CRUZ also has a 2013 charge of Alien inadmissibility under the section 212 of the INA through Immigration and

Customs Enforcement (ICE) and was removed from the United States on or about March 12, 2013. Based on information obtained through this investigation, agents have learned that G. CRUZ supplies several drug customers, including ANDUJAR and his son Alejandro CRUZ (A. CRUZ). Additionally, it is believed that G. CRUZ has coordinated with O. CRUZ to obtain shipments and multi-kilogram quantities of cocaine and further distribute the cocaine in Knoxville, Tennessee. G. CRUZ was previously the user of Target Telephone 4 and is believed to currently be using telephone number (865) 386-7769, as will be detailed in this affidavit. Telephone number (865) 386-7769 is in frequent contact with Target Telephone 5.

18.     Dolores CRUZ RAMIREZ – D. CRUZ has no known criminal history. Based on information obtained through this investigation, agents believe D. CRUZ is a relative of G. CRUZ. D. CRUZ was the subscriber of Target Telephone 4 used by G. CRUZ. The following information is based upon the court ordered interception of wire communications of Target Telephone 4. During an intercepted call over Target Telephone 4, on September 2, 2021, when G. CRUZ was trying to move all the drugs from stash locations after learning of an associate being arrested, G. CRUZ directed D. CRUZ when he said, "accommodate me everything you have there underneath the, the, the over there, the, the, the sink." Based on those directions and the ongoing situation, I believe G. CRUZ was asking D. CRUZ to move the drugs that D. CRUZ had underneath or over the sink at an unknown location. D. CRUZ is believed to use telephone number (865) 209-1799. In addition to telephone number (865) 209-1799 being subscribed to "Dolores CRUZ, Financial Crimes Enforcement Network (FinCEN) documents that D. CRUZ is registered as a Money Services Business (MSB) with (865) 209-1799 listed as a contact for D. CRUZ. Telephone number (865) 209-1799 is in contact with Target Telephone 5.

19.     Jorge CARDOZA – CARDOZA has no known criminal history.  According to information obtained through the interception of Target Telephone 4, CARDOZA is a close associate of G. CRUZ.  The following information is based upon the court ordered interception of wire communications of Target Telephone 4.  In one intercepted call over Target Telephone 4, CARDOZA told G. CRUZ that he (CARDOZA) was going to the "little house" to get something.  Based on intercepted communications agents believe that the "little house" was the name used for a drug stash house located at 5015 Schubert Road, Knoxville, Tennessee.  Based on my knowledge from this investigation and intercepted communications over Target Telephone 4, I know that 5015 Schubert Road, Knoxville, Tennessee ("little house") is used by this DTO as a drug stash location.  Furthermore, based on surveillance of 5015 Schubert Road, Knoxville, Tennessee, is believed to be unoccupied.  Based on this call, agents believe that CARDOZA had access to the stash house and was possibly going to get drugs.  CARDOZA is believed to be the user of telephone number (405) 414-7584.  In addition to telephone number (405) 414-7584 being subscribed to "Jorge Cardoza Gaytan", Knoxville Police Department also documented telephone number (405) 414-7584 as a number provided by Jorge CARDOZA during law enforcement interaction on April 5, 2018.  Furthermore, law enforcement financial transaction database showed (405) 414-7584 was listed on multiple money wire transfers as a contact number for Jorge CARDOZA.  Telephone number (405) 414-7584 is in frequent contact with Target Telephone 5.

## IV.     PRIOR INTERCEPTIONS

20.     Based upon electronic surveillance ("ELSUR") record checks of the DEA, Homeland Security Investigation ("HSI"), Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") and Federal Bureau of Investigation ("FBI") indices on November 8, 2021, there have

been no other federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications to or from Target Telephone 5, and no other federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications of any of the Target Interceptees/Subjects specified in this affidavit, except for the following:

a)      On February 3, 2021, the Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, signed an order authorizing the interception of wire communications over Target Telephone 1, (865) 722-2019 used by CAMPBELL. Interception pursuant to that Order was initiated on February 3, 2021.  The authorization to intercept Target Telephone 1 expired on March 4, 2021.  CAMPBELL, MARCANO ROMAN, LANXTER, and WARREN were listed as Target Interceptees in the original Order for interception of Target Telephone 1.  The affidavit filed in support of the application to intercept Target Telephone 1 is fully incorporated herein.

b)      On April 1, 2021, the Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, signed an order authorizing the interception of wire and electronic communications over Target Telephone 2, (865) 235-5008 used by MARCANO ROMAN.  Interception pursuant to that Order was initiated on April 2, 2021.  The authorization to intercept Target Telephone 2 expired on May 1, 2021.  CAMPBELL, MARCANO ROMAN, ANDUJAR and INESTROZA were listed as Target Interceptees in the original order for interception of Target Telephone 2.  The affidavit filed in support of the application to intercept Target Telephone 2 is fully incorporated herein.

c)      On July 12, 2021, the Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, signed an order authorizing the interception of wire

and electronic communications over Target Telephone 3, (865) 255-9911 used by ANDUJAR. Interception pursuant to that Order was initiated on July 14, 2021. The authorization to intercept Target Telephone 3 will expire on August 12, 2021. ANDUJAR, MARCANO ROMAN, RODRIGUEZ, ROMAN, and WHITE were listed as Target Interceptees in the original order for interception of Target Telephone 3. The affidavit filed in support of the application to intercept Target Telephone 3 is fully incorporated herein.

        d)      On August 16, 2021, the Honorable Thomas A. Varlan, United Stated District Judge for the Eastern District of Tennessee, signed an order authorizing the interception of wire communications over Target Telephone 4, (865) 978-3261 used by G. CRUZ. Interception pursuant to that Order was initiated on August 17, 2021. The authorization to intercept Target Telephone 4 expired on September 15, 2021[3]. G. CRUZ, ANDUJAR, Guadalupe ALVA, and UM-8197 were listed as Target Interceptees in the original order for interception of Target Telephone 4. The affidavit filed in support of the application to intercept Target Telephone 4 is fully incorporated herein.

## V.     BACKGROUND INFORMATION FOR COOPERATING SOURCES

        21.     For ease of reference, confidential sources (CSs) will be referred to herein in the masculine gender regardless of his or her true gender. Confidential Source 1 (hereinafter referred to as "CS-1"), Confidential Source 2 (hereinafter referred to as "CS-2") and Confidential Source 3 (hereinafter referred to as "CS-3") all provided information regarding this Drug Trafficking Organization (DTO), specifically, regarding CAMPBELL, MARCANO ROMAN and ANDUJAR. However, neither CS-1, CS-2 nor CS-3 has any knowledge or information

---

[3] On approximately September 3, 2021, Target Telephone 4 no longer made outgoing calls or text. However, Target Telephone 4 continued to have incoming calls and text messages that were not answered. According to T-Mobile the account for Target Telephone 4 remained active through the intercept expiration. Agents continued to monitor the intercept of Target Telephone 4 in the event that G. CRUZ began using it again.

regarding G. CRUZ or O. CRUZ. CS-1, CS-2 and CS-3's knowledge and cooperation are incorporated in previous affidavits and fully incorporated herein.

22. Confidential Source 4 (hereinafter referred to as "CS-4") has previously been arrested on drug related offenses. CS-4 is a reliable confidential source that has provided accurate, truthful, and detailed information to officers with the Tennessee Bureau of Investigation ("TBI"). CS-4 has a 2021 arrest for conspiracy to distribute 50 grams or more of methamphetamine and conspiracy to distribute 5 kilograms or more of cocaine. CS-4 is familiar with illegal drug terms and has shown knowledge of narcotics to include cocaine, methamphetamine and marijuana, regarding their appearance, color, and methods of distribution.

23. CS-4 has provided information regarding the illegal activities of G. CRUZ and O. CRUZ. CS-4 provided historical information specifically regarding O. CRUZ. CS-4 initially came to Knoxville, Tennessee and was distributing marijuana to O. CRUZ at the direction of another individual. CS-4 stated O. CRUZ then began to distribute narcotics to include marijuana, cocaine and methamphetamine. CS-4 was associated with O. CRUZ for some time and assisted O. CRUZ with distributing/obtaining narcotics, obtaining payments for the DTO and disassembling vehicles which had narcotics concealed inside.

24. I believe that the information supplied by CS-4 is truthful, reliable, and accurate. CS-4 is cooperating with law enforcement in this investigation for potential consideration with criminal charges. No promises or guarantees of reduction or dismissal of criminal charges have been made to CS-4 in exchange for CS-4's cooperation.

## VI.    PROBABLE CAUSE

25. Pursuant to this Court's previous Orders in this matter, agents began intercepting wire communications over Target Telephone 1 on February 3, 2021, Target Telephone 2 on

April 2, 2021, Target Telephone 3 on July 14, 2021, and Target Telephone 4 on August 17, 2021. The interceptions on Target Telephone 1 ended on March 4, 2021, the interceptions on Target Telephone 2 ended on May 1, 2021, the interceptions on Target Telephone 3 expired on August 12, 2021, and the interceptions on Target Telephone 4 expired on September 15, 2021. The communications intercepted during the interception of Target Telephone 4 revealed that G. CRUZ, coordinated with O. CRUZ, the user of Target Telephone 5, to obtain multi-kilogram quantities of cocaine for the DTO and then distributed the cocaine to G. CRUZ, as well as other yet identified individuals.

26.     This application therefore seeks the initial interception of wire and electronic communications over Target Telephone 5, which is used by O. CRUZ. If granted, the interception will enable investigators to identify sources of supply for the organization, ascertain the organization's means of smuggling narcotics and drug proceeds, and to identify stash locations, customers, and facilitators associated with the organization.

27.     On August 23, 2021, at 12:29 p.m. (Target Telephone 4, Session #324) an unknown male (UM-2349), using telephone (678) 986-2349 contacted G. CRUZ at Target Telephone 4. The following conversation occurred:[4]

| | |
|---|---|
| G. CRUZ: | [Unintelligible] |
| UM-2349: | Listen! Uh, I have, I have an order here for you! |
| G. CRUZ: | Oh, shit! |
| UM-2349: | Yes, I don't know if has arrived, uh… I already called your brother like about three (3), four (4) times. He doesn't answer the call. |
| G. CRUZ: | Oh, damn! |
| | [Voices overlap] |

---

[4] The transcripts of the communications included in this Affidavit may include translations from Spanish to English that were prepared by contract monitors who are fluent in the Spanish language. The transcripts do not necessarily include the entire conversation. Instead, only the relevant portions of the conversation are included.

Case 3:21-mc-05012-TAV   Document 2   Filed 11/24/21   Page 17 of 79   PageID #: 40

| UM-2349: | But I know, but, but I know I'm going to you. |
|---|---|
| G. CRUZ: | Oh shit! Let me check, let me give him a call. |
| UM-2349: | Give him a, give him a call. I'm… |
| | [Voices overlap] |
| G. CRUZ: | All set. |
| UM-2349: | …I'm already, I'm already ready as soon as you are ready. |
| G. CRUZ: | All right, dude. All set. |
| UM-2349: | All right, all right. All set. |
| | [End of call] |

Based on my training, experience, knowledge of this investigation and other intercepted communications, I believe the above call from UM-2349 regarded UM-2349 arriving with a drug shipment and trying to get into contact with O. CRUZ, G. CRUZ's brother. Toll records from T-Mobile indicated that UM-2349 had called Target Telephone 5 two times prior to calling G. CRUZ at Target Telephone 4. The two calls from UM-2349 to Target Telephone 5 occurred at 12:26 p.m. and 12:28 p.m. When UM-2349 said, "I have an order here for you," I believe he was telling G. CRUZ that the drug shipment had arrived. When UM-2349 said, "I don't know if has arrived, uh… I already called your brother like about three (3), four (4) times. He doesn't answer the call," I believe he was trying to explain to G. CRUZ that he had tried to call O. CRUZ multiple times and called G. CRUZ because he could not get O. CRUZ to answer. When G. CRUZ responded, "Let me check, let me give him a call," I believe G. CRUZ was telling UM-2349 that he would call O. CRUZ.

28.     Approximately ten minutes later, on August 23, 2021, at 12:40 p.m., (Target Telephone 4, Session #239) G. CRUZ, using Target Telephone 4 called O. CRUZ at Target Telephone 5. During the intercepted call, the following conversation occurred:

| O. CRUZ: | Hello! |
|---|---|

| | | |
|---|---|---|
| G. CRUZ: | What's up? Listen, they're looking for you … the guy… |
| | [Voices overlap] |
| O. CRUZ: | [Background: Music] Where are you? |
| G. CRUZ: | I'm here at the house. |
| O. CRUZ: | Who, who, what guy? |
| G. CRUZ: | The, that one, the brother of the dude that came the other day. |
| O. CRUZ: | Oh, well they called me but, well ask him where he's at. |
| G. CRUZ: | He said he was nearby, that, that, that it is just a matter of telling him where, where we would see him. |
| | [Voices overlap] |
| O. CRUZ: | Oh, well send him to the shop, no dude? You, where, what are you doing? |
| G. CRUZ: | [Background: Silverware clinking] Nothing, here dude, I'm eating. |
| O. CRUZ: | Oh, tell him to go to the shop dude, because I have to check them before I leave. |
| G. CRUZ: | All right, then. Should I tell him to head that way? |
| O. CRUZ: | Uh-huh, and to take it out right now. I'll pass by shortly, I'm going to get the *papel*. |
| G. CRUZ: | All right, then. All set. |
| | [End of call] |

Based on my training, experience, and knowledge of this investigation, I believe G. CRUZ called O. CRUZ to tell O. CRUZ that UM-2349 was there with the shipment of drugs. When G. CRUZ said, "What's up? Listen, they're looking for you … the guy…," I believe G. CRUZ was telling O. CRUZ that UM-2349 was trying to get in contact with O. CRUZ. When O. CRUZ asked, "Who, who, what guy?," I believe O. CRUZ was asking G. CRUZ who G. CRUZ was talking about. G. CRUZ responded, "The, that one, the brother of the dude that came the other day." I believe that G. CRUZ was being careful not to say any names over the telephone but provided enough information for O. CRUZ to understand who he was talking about. When O. CRUZ said, "Oh, well they called me but, well ask him where he's at," I believe O. CRUZ acknowledged

that UM-2349 had tried to call him and instructed G. CRUZ to ask UM-2349 where he was at. G. CRUZ responded, "He said he was nearby, that, that, that it is just a matter of telling him where, where we would see him," meaning that UM-2349 was close and just need to know where to go. When O. CRUZ said, "Oh, tell him to go to the shop dude, because I have to check them before I leave," I believe O. CRUZ instructed G. CRUZ to have UM-2349 take the drug shipment to "the shop" which agents identified as a shop located at 210 E. Inskip Drive, Knoxville, Tennessee. When G. CRUZ asked, "All right, then. Should I tell him to head that way," I believe G. CRUZ was asking O. CRUZ if he need to tell UM-2349 to head over to "the shop." When O. CRUZ responded, "Uh-huh, and to take it out right now. I'll pass by shortly, I'm going to get the *papel*," I believe O. CRUZ wanted UM-2349 to unload the drug shipment at the shop and explained that he would be by the shop shortly after he got the "papel," (Spanish for paper) which I believe to mean money.

29. Immediately after the call with O. CRUZ, on August 23, 2021, at 12:41 p.m., (Target Telephone 4, Session #330) G. CRUZ called UM-2349 at (678) 986-2349. During the call the following conversation took place:

| | |
|---|---|
| UM-2349: | What's up, buddy? |
| G. CRUZ: | What happened? |
| UM-2349: | I was going to tell you; did you already talk to your brother? |
| G. CRUZ: | Oh, yes! He says… |
| | [Voices overlap] |
| UM-2349: | Okay. |
| G. CRUZ: | … that in about twenty (20) minutes he will see you there at the shop. |
| UM-2349: | Okay! All set, then… |
| | [Voices overlap] |

| | |
|---|---|
| G. CRUZ: | Uh, [U/I] [Burps] |
| UM-2349: | …Is he going to go, or are you coming? |
| G. CRUZ: | He is going to go. |
| UM-2349: | Okay. So I will, I will, I will start heading that way then. |
| G. CRUZ: | Yes! He said that in twenty (20), in half an hour, he's going to go get the *papel*. |
| UM-2349: | Okay. All set, buddy. It's the… |
| | [Voices overlap] |
| G. CRUZ: | All right… |
| UM-2349: | I'm now, I'm now going to… Hey! |
| G. CRUZ: | All right, then. |
| UM-2349: | All right, then. Bye. |
| | [End of call] |

Based on my training, experience and knowledge of this investigation G. CRUZ contacted UM-2349 to inform him that O. CRUZ would meet him at "the shop." When UM-2349 asked, "did you already talk to your brother," I believe he was asking if G. CRUZ had already talked to O. CRUZ. When G. CRUZ affirmed and said, "… that in about twenty (20) minutes he will see you there at the shop," I believe he explained to UM-2349 that O. CRUZ would meet UM-2349 at "the shop" in about twenty minutes. When UM-2349 asked, "Is he going to go, or are you coming," I believe he was asking if O. CRUZ would meet him at the shop or if G. CRUZ would meet him at the shop. G. CRUZ responded, "He is going to go," meaning that O. CRUZ would meet UM-2349 at the shop. When G. CRUZ said, "He said that in twenty (20), in half an hour, he's going to go get the *papel*," I believe he was explaining that it would take O. CRUZ a little while because O. CRUZ was going to go get the money to pay for the drug shipment. As a result of the above intercepted communications, agents conducted surveillance in the area of 210 E. Inskip Drive, Knoxville, Tennessee (the shop). At approximately 1:45 p.m., agents identified a pick-up truck bearing Tennessee license plate 73A L01 depart "the shop" property. A query of

law enforcement databases identified the register owner of Tennessee license plate 73A L01 was registered to Oscar RAMIREZ at 3105 Clintwood Way, Pigeon Forge, Tennessee.

30. Approximately an hour later, on August 23, 2021, at 1:39 p.m., (Target Telephone 4, Session #333) G. CRUZ contacted ANDUJAR at (865) 978-3261. During the call the following conversation took place:

> [Call in progress]
>
> G. CRUZ: Yes, no, no, no. Listen dude because…get on the ball because the number might come down, dude. This is why I called you, dude.
>
> [Voices overlap]
>
> ANDUJAR: Okay, but you, you…uh, if you tell me I can get more people.
>
> [Voices overlap]
>
> G. CRUZ: I am working on that, I am working on that right now, dude.
>
> ANDUJAR: Okay, because it is very slow.
>
> [Voices overlap]
>
> G. CRUZ: Yes, so you can get on the…yes, you can get on the ball. Let me see how, how the number is going to settle today…
>
> [Voices overlap]
>
> ANDUJAR: Uh-huh.
>
> G. CRUZ: …and I will let you know later, dude.
>
> ANDUJAR: Okay. Because everybody has…
>
> [Voices overlap]
>
> G. CRUZ: So, you can get…
>
> [Voices overlap]
>
> ANDUJAR: …everybody has it already.
>
> G. CRUZ: No. I know it is true. I know how everything is.
>
> [Voices overlap]
>
> ANDUJAR: I know, you know? Umm…
>
> [Voices overlap]

| | |
|---|---|
| G. CRUZ: | Uh-huh. |
| ANDUJAR: | …here, you understand? I have there already…I still have about eight of the ones you gave me… |
| | [Voices overlap] |
| G. CRUZ: | [Burps] |
| ANDUJAR: | …the big ones, for, for me to have your money. |
| G. CRUZ: | All right, dude. |
| ANDUJAR: | All set. But the… |
| | [Voices overlap] |
| G. CRUZ: | Get on the ball dude, and I will see… |
| | [Voices overlap] |
| ANDUJAR: | No, [Unintelligible] … |
| | [Voices overlap] |
| G. CRUZ: | …if I have good news for you. |
| ANDUJAR: | All right, thank you. Take care. |
| | [Voices overlap] |
| G. CRUZ: | All right, dude. |
| ANDUJAR: | Bye, bye. |
| | [End of call] |

Based on my training and experience, I believe G. CRUZ called ANDUJAR to see where ANDUJAR was at with selling the cocaine ANDUJAR had and to inform ANDUJAR that the price may come down. When G. CRUZ said, "Listen dude because…get on the ball because the number might come down, dude. This is why I called you, dude," I believe G. CRUZ was telling ANDUJAR that ANDUJAR needed to hurry and sell the cocaine he had because the prices ("number") might come down. When ANDUJAR said, "if you tell me I can get more people," I believe he was wanting G. CRUZ to tell him what the new price would be so ANDUJAR could get more cocaine customers. When G. CRUZ said, "I am working on that, I am working on that right now, dude," I believe he meant that he was still working on getting the new prices based on

the drug delivery from UM-2349. When ANDUJAR said, "I still have about eight of the ones you gave me...the big ones, for, for me to have your money," I believe ANDUJAR was explaining to G. CRUZ that ANDUJAR still had eight quantities of cocaine that G. CRUZ had given him and that he had to sell them to have G. CRUZ's money.

31. On August 23, 2021, at 7:27 p.m. (Target Telephone 4, Session #424) ANDUJAR using telephone (865) 255-9911, called G. CRUZ at Target Telephone 4. During the call the following conversation took place:

| | |
|---|---|
| G. CRUZ: | [Background: Nail gun] What's up dude? |
| ANDUJAR: | [Audio glitch] Hello? What are you doing? |
| G. CRUZ: | [Background: Nail gun] Here, here at a little job. Tell me! |
| ANDUJAR: | Umm... [Background: Car horn] ...umm, hey! What was the price you told me, still, uh...because they are calling me. But the thing is... |
| | [Voices overlap] |
| G. CRUZ: | [Background: Nail gun] Oh, but I do not know, that was [Unintelligible] ...that is for right now. I think that will be for the following week, dude. |
| | [Background: Unintelligible voices.] |
| ANDUJAR: | Okay, because there is a guy who wants one, but he said he is paying thirty-six (36) for it. But the only... |
| | [Voices overlap] |
| G. CRUZ: | [Background: Nail gun] Uh-huh! |
| ANDUJAR: | ...I could, maybe I could get from him about thirty-eight (38), but there it already...or thirt...I am not going to make money, to give to you. Because, that's, is what I am working on. |
| G. CRUZ: | Yes. [Background: Nail gun] Well, I... |
| | [Voices overlap] |
| ANDUJAR: | Yes. |

| | |
|---|---|
| G. CRUZ: | …do not know, dude. [Background: Nail gun] But I am telling you it's going to be later on, dude. It will be for next week, maybe. But I am… |
| | [Voices overlap] |
| ANDUJAR: | Oh. |
| G. CRUZ: | …doing is working right now, dude. Um-hum. |
| ANDUJAR: | Okay. Well, let me know if…but, because I want to start paying you, but, you understand me? Like… |
| | [Voices overlap] |
| G. CRUZ: | Yes. |
| ANDUJAR: | …it's that, already all, already all, look at the price he is paying. I just went to his house a just now… |
| | [Voices overlap] |
| G. CRUZ: | Uh-huh! |
| ANDUJAR: | …to ask, to ask him what is happening, and that, and, uh, and he told me "It's that, dude, it's that I'm paying thirty-six (36)". |
| G. CRUZ: | Uh-huh! |
| ANDUJAR: | You understand me? |
| G. CRUZ: | Yes, yes, yes. |
| ANDUJAR: | And, and, it is like…you would do, you, uh, you would do the same too, if you were paying a better price, right? |
| G. CRUZ: | No, I know, I know, dude. |
| ANDUJAR: | Yeah, that's why, but right now is like…everybody has it here. But I am selling what I have here of yours, but it's already going out. Already, already… |
| | [Voices overlap] |
| G. CRUZ: | All right. No, well, I, I will let you know, dude. |
| | [Voices overlap] |
| ANDUJAR: | Okay, let me know. Try to… |
| | [Voices overlap] |
| G. CRUZ: | When I am ready for that, I will let you know. [Background: Nail gun] |

| | |
|---|---|
| ANDUJAR: | Yes, try the lowest I can, because…to bring my people back again to start moving it. But, by…. |
| | [Voices overlap] |
| G. CRUZ: | Yes, dude. |
| ANDUJAR: | … by the twenty-eighth (28) I need a, a, a half. And maybe by tomorrow, like already, already I might run short. I need to sell ten (10), ten (10) uh, uh… |
| | [Voices overlap] |
| G. CRUZ: | Call me dude, call me… |
| | [Voices overlap] |
| ANDUJAR: | …nine (9). |
| | [Voices overlap] |
| G. CRUZ: | …call me, call me. |
| ANDUJAR: | Its' fine. Okay. |
| | [Voices overlap] |
| G. CRUZ: | I have them there, uh, I have a whole one there, some little quarters, dude. |
| ANDUJAR: | Okay, all right. All set! |
| G. CRUZ: | All right, all set. |
| | [Voices overlap] |
| ANDUJAR: | All right, bye. |
| | [End of call] |

Based on my training, experience and knowledge of this investigation, I believe the above conversation regarded ANDUJAR asking G. CRUZ how much it was going to be for a kilogram of cocaine. When ANDUJAR asked, "What was the price you told me, still, uh…because they are calling me," I believe he was G. CRUZ what the price was for cocaine because he had drug customers calling him. When G. CRUZ said, "Oh, but I do not know, that was [Unintelligible] …that is for right now. I think that will be for the following week, dude," I believe G. CRUZ was explaining that the new price was for the new cocaine they received and not for what

ANDUJAR already had.  When ANDUJAR said, "Okay, because there is a guy who wants one, but he said he is paying thirty-six (36) for it," I believe he was explaining that he had a drug customer that wanted one kilogram, but the customer is currently paying $36,000 for a kilogram. When ANDUJAR continued, "I could, maybe I could get from him about thirty-eight (38), but there it already…or thirt…I am not going to make money, to give to you," I believe he meant that he might be able to get $38,000 for a kilogram but then he still would not make enough money to G. CRUZ.  When ANDUJAR said, "Okay. Well, let me know if…but, because I want to start paying you, but, you understand me," I believe ANDUJAR is telling G. CRUZ to keep ANDUJAR informed about the price of cocaine and ANDUJAR is indicating that he owes G. CRUZ money and the more cocaine he can sell will reduce what is owed to G. CRUZ.  When ANDUJAR said, "Yeah, that's why, but right now is like…everybody has it here." I believe ANDUJAR is telling G. CRUZ that cocaine is readily available in the area from multiple individuals.  When ANDUJAR said, "Yes, try the lowest I can, because…to bring my people back again to start moving it." I believe ANDUJAR is telling G. CRUZ he (ANDUJAR) needs the lowest price possible in order to increase his (ANDUJAR's) cocaine distribution to customers.  When ANDUJAR said, "… by the twenty-eighth (28) I need a, a, a half. And maybe by tomorrow, like already, already I might run short. I need to sell ten (10), ten (10) uh, uh…," I believe ANDUJAR is telling G. CRUZ specific quantities of cocaine that he will require on the following day and then possibly on August 28, 2021.  When G. CRUZ responds, "I have them there, uh, I have a whole one there, some little quarters, dude.," I believe G. CRUZ is telling ANDUJAR the specific amounts of cocaine he (G. CRUZ) has available at that time.

32.    On September 2, 2021, at 1:20 p.m., (Target Telephone 4, Session #873) G.

CRUZ received a call from an unknown male (UM-8672), using telephone number (865) 274-

8672.  During the call the following conversation took place:

| | |
|---|---|
| G. CRUZ: | Hey! [Background: Unintelligible voices] |
| UM-8672: | What are you doing? |
| G. CRUZ: | Here. Tell me. |
| UM-8672: | Where are you? |
| G. CRUZ: | Here with Mom. |
| UM-8672: | Listen, uh, help me… |
| | [Voices overlap] |
| G. CRUZ: | Tell me. |
| UM-8672: | …to get out, uh, some things from the little house. Well, I believe they caught Junior, the fucking, … |
| | [Voices overlap] |
| G. CRUZ: | [Coughs] |
| UM-8672: | …that dude! |
| G. CRUZ: | Oh, no shit! All set. I am going there right now. Bye, all set, all set! |
| UM-8672: | Right now, because I am leaving already, I have a… |
| | [Voices overlap] |
| G. CRUZ: | All set, I'm coming, I'm coming, I'm coming. |
| UM-8672: | …I have an appointment, dude. To… |
| | [Voices overlap] |
| G. CRUZ: | All set, I'm coming, I'm coming, I'm coming. |
| | [Voices overlap] |
| UM-8672: | …put them in your truck and then leave already… |
| | [Voices overlap] |
| G. CRUZ: | All set, cool… |
| | [Voices overlap] |
| UM-8672: | … to get everything out of there. |

|  | [Voices overlap] |
| G. CRUZ: | …all set…all set, all set, all set, all set. |
|  | [Voices overlap] |
| UM-8672: | Bye! |
|  | [Voices overlap] |
| G. CRUZ: | I'm coming. |
|  | [End of call] |

Based on my training, experience, and knowledge of this investigation, I believe the above conversation was about CS-4 getting arrested and UM-8672 telling G. CRUZ to move the cocaine from the stash house, which is believed to be located at 5015 Schubert Road, Knoxville, Tennessee. When G. CRUZ said, "Here with Mom," I believe he was telling UM-8672 that he was at their mom's house, which agents believe to be 702 Henrietta Drive, Knoxville, Tennessee. When UM-8672 said, "Listen, uh, help me…to get out, uh, some things from the little house. Well, I believe they caught Junior…," I believe UM-8672 was directing G. CRUZ to get the cocaine out of the "little house" which agents identified as 5015 Schubert Road, Knoxville, Tennessee. UM-8672 went on to say that he believed "Junior" had been caught. Based on information from Tennessee Bureau of Investigation (TBI) agents learned that "Junior" was CS-4. Furthermore, the address listed on CS-4's Tennessee driver's license was 5015 Schubert Road, Knoxville, Tennessee, which would explain why UM-8672 wanted G. CRUZ to get the cocaine out. When G. CRUZ said, "All set, I'm coming, I'm coming, I'm coming," I believe G. CRUZ acknowledged that CS-4 had been arrested and that he would go to 5015 Schubert Road, Knoxville, Tennessee to get the stuff out. When UM-8672 said, "…put them in your truck and then leave already to get everything out of there," I believe UM-8672 was telling G. CRUZ to put all the stuff in G. CRUZ's truck from the mom's house and then leave to go to the "little

house" to get all the drugs out of there. Based on intercepted calls, agents believe that the DTO used the "mom's house" to stash drug proceeds and used the "little house" as a drug stash house.

33.    Approximately 20 minutes later, on September 2, 2021, at 1:44 p.m., (Target Telephone 4, Session #877) O. CRUZ using Target Telephone 5 called G. CRUZ at 865-978-3261. During the call the following conversation took place:

| | |
|---|---|
| G. CRUZ: | Tell me. |
| O. CRUZ: | Oh, did you arrive already? |
| G. CRUZ: | Yes. |
| O. CRUZ: | All right. |
| G. CRUZ: | Uh-hum. |
| O. CRUZ: | Yes, [Unintelligible]… |
| | [Voices overlap] |
| G. CRUZ: | There, uh, did you leave me the keys? |
| O. CRUZ: | Oh, yes, they are in the… in that drawer where they always are, where you always leave them. |
| G. CRUZ: | All right, no, all right, all right, all right. [Inhales]. |
| | [Voices overlap] |
| O. CRUZ: | Uh-huh. |
| G. CRUZ: | No, well, we will see what fucking mess is going to happen. [Clears throat]. |
| O. CRUZ: | Well, I don't know, but I don't think that dude will hold on. But what with one? Well, yes, he knows…well, maybe, uh… |
| | [Voices overlap] |
| G. CRUZ: | Well… |
| | [Voices overlap] |
| O. CRUZ: | …they are going to tell him. |
| | [Voices overlap] |
| G. CRUZ: | …the house… |

| O. CRUZ: | No, they are going to tell him to put some of what he can give, you know how… |
|---|---|
| | [Voices overlap] |
| G. CRUZ: | Yes. |
| O. CRUZ: | …like always. |
| G. CRUZ: | If there are pictures, well, yes. Hopefully there are no pictures. Um-hum. |
| | [Voices overlap] |
| O. CRUZ: | Yes. |
| G. CRUZ: | That is the problem. |
| | [Voices overlap] |
| O. CRUZ: | Hopefully that dude does not put any pictures. |
| G. CRUZ: | Yes, dude, well hopefully, dude. Um-hum. |
| | [Voices overlap] |
| O. CRUZ: | Yes. |
| | [Voices overlap] |
| G. CRUZ: | Well, I… |
| | [Voices overlap] |
| O. CRUZ: | Did I not tell you about something, about that, well what they had broken up that woman? |
| G. CRUZ: | Well, that idiot guy, if he already knew, well he should have fucking left, because they went to get him. |
| O. CRUZ: | Yes |
| | [Voices overlap] |
| G. CRUZ: | Idiots! He was next to him, and I said "is he really still here? I don't think so". He knowing they were going for him, how am I going to believe… |
| | [Voices overlap] |
| O. CRUZ: | And I don't know, I don't know if… [Background: Clinking noise]…I don't know if the woman, maybe she is just nosing around, well because supposed… |
| | [Voices overlap] |
| G. CRUZ: | Maybe. |

| | |
|---|---|
| O. CRUZ: | …because it supposedly…supposedly the… [Background: Clinking noise] …the, the, the girls, they uh, they were, they took her girls. |
| G. CRUZ: | Uh-huh. |
| O. CRUZ: | And that well, well she…how they were going to leave her? and well, that well I told her, that Adal told her uh, that maybe… that they might put her inside too. |
| G. CRUZ: | Oh, yes? |
| O. CRUZ: | Uh-huh. |
| G. CRUZ: | All right.  No, well, it's fucked up. We'll see what happens.  I am going to be here for a while. I told Nando to come pick me up so I can leave the truck here, [Clears throat] and leave to… |
| | [Voices overlap] |
| O. CRUZ: | Oh, that one, that one opens up, no? Anyway? |
| G. CRUZ: | [Inhales] No, I already, already closed, closed the, the cover. I have a key for the cover. |
| O. CRUZ: | Oh, well, well, if not for…take them inside. I believe I have a house key here, there in the truck. If you want to, and tomorrow I will swing by the, uh, to at least have the "papel" elsewhere since the other is not a problem, the "papel", because I still have to pay for some things. |
| G. CRUZ: | Yes, yes, yes, well…no listen, the truck is here, and uh, I uh, uh, if you want I can leave you the keys. Or you can call me early… |
| | [Voices overlap] |
| O. CRUZ: | Leave them inside for me. |
| G. CRUZ: | Yes, I will leave them there… |
| | [Voices overlap] |
| O. CRUZ: | No… |
| | [Voices overlap] |
| G. CRUZ: | …on the table. |
| O. CRUZ: | Leave them on the table. I have a key here, I believe so. |
| G. CRUZ: | Oh, yes? |
| | [Voices overlap] |
| O. CRUZ: | Yes. |

| | |
|---|---|
| G. CRUZ: | Oh, well it is good. My mother is not going to come here anyway, dude. Well you see my father just left. |
| O. CRUZ: | Yes, dude. Well it is better… |
| | [Voices overlap] |
| G. CRUZ: | It's going to be alone here. |
| O. CRUZ: | …not to, uh, try not to take anyone for, while I find something safe. |
| | [Voices overlap] |
| G. CRUZ: | No, no, no, no, no, here, no, no, no one will enter here, dude. Nando comes here sometimes, but he plays the fool, but that is all. [Inhales] Yes, no, no, no, no. Do not worry about that, dude. |
| O. CRUZ: | Oh, yes [audio glitch] I am not going to put inside [Unintelligible] because it is not going to be safe there. |
| G. CRUZ: | [Background: Money shuffling] No, well, I…No, well no one enters in here. I tell you…well just when we are here, but… [coughs]…only [coughs]. What do you think? |
| | [Voices overlaps] |
| O. CRUZ: | Yes. |
| G. CRUZ: | That's right, dude. [Background: Money shuffling] [U/I] |
| | [Voices overlap] |
| O. CRUZ: | No, I believe that dude will. Well…or, I don't know, maybe, if he has it too tough, then yes. If not maybe, if anything else, maybe…but, uh… |
| | [Voices overlap] |
| G. CRUZ: | [Background: Money shuffling] Well… |
| O. CRUZ: | … but it's that that dude was, I believe, hanging out with Cri-Cri and all of that shit. |
| G. CRUZ: | With the ones with the trucks, no? |
| O. CRUZ: | Uh-huh. And well… |
| | [Voices overlap] |
| G. CRUZ: | Yes, right, dude? |
| O. CRUZ: | …no, and with the … [Unintelligible] of everything. You see that dude worked with everything. |
| G. CRUZ: | Uh-huh. |

| O. CRUZ: | Oh. I think that's why. |
|---|---|
| G. CRUZ: | Damn, it went to hell, it went to hell. Um-hum. We'll see what happens … |
| | [Voices overlap] |
| O. CRUZ: | No, well, we will be in touch. Tomorrow I will, … leave them there on the table, dude. I will, I will accommodate there tomorrow. |
| G. CRUZ: | Let me know of anything. If not, I'll come here early tomorrow. Tell me… |
| | [Voices overlap] |
| O. CRUZ: | No, let's do it that way not to be … |
| G. CRUZ: | …tell me what to do. It's up to you. |
| | [Voices overlap] |
| O. CRUZ: | Uh, [Unintelligible]. |
| | [Voices overlap] |
| G. CRUZ: | It's up to, it's up to you. |
| | [Voices overlap] |
| O. CRUZ: | I'll wait for you tomorrow, so you can rest. All right. |
| G. CRUZ: | All right, dude. All set. |
| | [End of call] |

Based on my training, experience, and knowledge of this investigation, I believe the purpose of the conversation was to make sure G. CRUZ concealed the money and drugs and left the keys for O. CRUZ to come by later. I further believe G. CRUZ and O. CRUZ discussed the possible outcome of CS-4 being arrested and what CS-4 might tell law enforcement. When O. CRUZ asked, "Oh, did you arrive already," I believe he was asking if G. CRUZ had already arrived to get the stuff from the stash house. When G. CRUZ responded, "Yes," I believe G. CRUZ was acknowledging that he was already there. When G. CRUZ said, "No, well, we will see what fucking mess is going to happen," I believe he was referring to the arrest of CS-4. When O. CRUZ said, "Well, I don't know, but I don't think that dude will hold on," I believe O. CRUZ

was telling G. CRUZ that he was worried CS-4 would talk to law enforcement. When O. CRUZ said, "they are going to tell him to put some of what he can give, you know how…," I believe he was telling G. CRUZ that law enforcement would tell CS-4 to provide information. When G. CRUZ said, "If there are pictures, well, yes. Hopefully there are no pictures," I believe he was referring to pictures that CS-4 may have had of them and that hopefully CS-4 did not have any pictures. When O. CRUZ said, "Hopefully that dude does not put any pictures," I believe he was acknowledging G. CRUZ and that he hoped CS-4 did not have any pictures. When O. CRUZ said, "Oh, well, well, if not for…take them inside. I believe I have a house key here, there in the truck. If you want to, and tomorrow I will swing by the, uh, to at least have the "papel" elsewhere since the other is not a problem, the "papel", because I still have to pay for some things," I believe O. CRUZ was telling G. CRUZ to leave the key to his truck bed cover inside the house, since O. CRUZ had a key to house. Additionally when he said "papel" I believe he was referring to money. When O. CRUZ said, "Yes, dude. Well it is better not to, uh, try not to take anyone for, while I find something safe," I believe O. CRUZ was telling G. CRUZ not do deal with anyone until O. CRUZ could find somewhere safe for the drugs and money. When G. CRUZ said, "No, no, no, no, no, here, no, no, no one will enter here, dude. Nando comes here sometimes, but he plays the fool, but that is all. [Inhales] Yes, no, no, no, no. Do not worry about that, dude," I believe he was telling O. CRUZ that no one would go into the house except "Nando" which agents believe is G. CRUZ's son Alejandro CRUZ. When O. CRUZ said, "You see that dude worked with everything," I believe he was telling G. CRUZ that CS-4 dealt with all kinds of drugs not just cocaine.

34. On two occasions in September 2021, CS-4, who was arrested in early September 2021, was interviewed by TBI as part of a proffer agreement for judicial consideration. CS-4

stated prior to living in Tennessee, he lived in Pasco, Washington and was transporting drugs and money for an individual named Homero CUEVAS ("CUEVAS"). CS-4 stated he initially moved to Knoxville, TN approximately 18 to 24 months prior to his arrest in September 2021. CS-4 stated he came to Tennessee initially delivering marijuana from CUEVAS in Washington to O. CRUZ in Knoxville, Tennessee. When he initially moved to Tennessee, CS-4 rented a residence from O. CRUZ located at 5015 Schubert Road, Knoxville, Tennessee. CS-4 stated O. CRUZ was purchasing approximately 100 to 150 pounds of marijuana at a time, from CUEVAS, and CS-4 was delivering the marijuana. HUOYA stated that approximately 3 to 4 months after arriving in Tennessee, CS-4 began to purchase narcotics from O. CRUZ, who was selling marijuana, cocaine and methamphetamine. CS-4 stated that he also purchased narcotics from G. CRUZ, but that O. CRUZ sold larger quantities of narcotics than G. CRUZ.

35.     CS-4 stated he also assisted O. CRUZ with obtaining large quantities of narcotics from associates of O. CRUZ. CS-4 stated on one occasion, O. CRUZ requested that CS-4 meet an individual at a gas station located between Knoxville, Tennessee and Nashville, Tennessee. CS-4 stated he met the individual who gave CS-4 a large package containing approximately 15 to 16 individual packages of narcotics. The individual also gave CS-4 a suitcase full of currency. CS-4 stated he also assisted O. CRUZ by taking apart vehicles that had narcotics hidden inside of them.

36.     After September 2, 2021, when G. CRUZ learned that CS-4 had been arrested, interceptions over Target Telephone 4, used by G. CRUZ, decreased dramatically in a manner consistent with someone "dropping' his phone. Calls and texts would continue to come in, but they went unanswered. Based on my training and experience, I know that drug dealers often change phone numbers after a member of their DTO is arrested or believed to be cooperating

with law enforcement. I further believed this the reason G. CRUZ stopped using, or "dropped," Target Telephone 4 and began using telephone number (865) 386-7769.

37.     Pen/trap information as well as the court-authorized wire and electronic interceptions over Target Telephone 4 show that Target Telephone 4 was not used to send outgoing calls or text messages since September 3, 2021. Target Telephone 4 did continue to receive incoming calls and texts that were not answered. According to T-Mobile, the account for Target Telephone 4 was still an active account as of November 4, 2021. Based on the information above and intercepted communications listed within this affidavit, I believe that G. CRUZ stopped using Target Telephone 4 on September 3, 2021, and is currently using telephone number (865) 386-7769 as a replacement telephone. Agents learned of telephone number (865) 386-7769 after obtaining tolls for telephones used by O. CRUZ (Target Telephone 5), ANDUJAR (Target Telephone 3), D. CRUZ ((865) 209-1799), and A. CRUZ ((865) 443-3853) after Target Telephone 4 was no longer utilized by G. CRUZ. Agents reviewed the toll records from those telephones and identified only one new telephone number in common communication with these telephones. According to Sprint, the account for telephone number (865) 386-7769 became active on the same date as Target Telephone 4 stopped being utilized, September 3, 2021. After identifying telephone number (865) 386-7769 as a possible replacement phone for Target Telephone 4, agents obtained toll records from Sprint, to identify numbers in communication with (865) 386-7769.

38.     The following is a summary of the common-call analysis of Target Telephone 4 and (865) 386-7769 showing that the latter number is the replacement phone for Target Telephone 4. An analysis of telephone records for (865) 386-7769 from September 3 to September 10, 2021, which reflects the first week after activation, revealed that (865) 386-7769

was in contact with a total of 18 phones. Out of those 18 phones, 12 phones (67%) also were in contact with Target Telephone 4. The analysis also showed a total number of 86 calls and text messages over (865) 386-7769 during the time period analyzed. Out of those 86 calls and text messages over (865) 386-7769, 68 calls and text messages (79%) were with phones that were also in contact with Target Telephone 4. Based on my training and experience, it is common that a replacement telephone will be in contact with many of the same numbers as the phone it replaced.

39.     Additionally, analysis of the last month Target Telephone 4 was utilized, August 3, 2021 through September 3, 2021, and the first month after activation of (865) 386-7769, September 3, 2021 through October 3, 2021, five of the top ten most frequent numbers in previous contact with Target Telephone 4 are now in contact with (865) 386-7769, and four of those numbers are in the top ten most frequent contact numbers of (865)386-7769. Based on my training and experience, top contacts are a major identifier for a replacement telephone because a user of a telephone will often have many of the same top contacts after replacing the original phone. Based on my knowledge of this investigation, I know that several members of the DTO stopped using their telephones around the same time. I believe this explains why the top ten contacts are not exactly the same between Target Telephone 4 and (865) 386-7769.

40.     The following is a summary of the analysis of the four telephone numbers that were in the top ten contacts of both Target Telephone 4 and (865) 386-7769. Included at the end of this section is a diagram displaying the analyzed data. Toll data was analyzed for the period of August 3, 2021 through September 3, 2021 for Target Telephone 4, and September 3, 2021 through October 3, 2021 for telephone number (865) 386-7769. Between August 15, 2021, and September 3, 2021, Target Telephone 4 exchanged 203 communications with telephone number

(865) 441-9713. Between September 24, 2021, and October 3, 2021, (865) 386-7769 exchanged 116 communications with telephone number (865) 411-9713. Furthermore (865) 411-9713 was the second top frequently contacted number for Target Telephone 4 and the first top frequently contacted number for telephone number (865) 386-7769. Between August 3, 2021, and September 2, 2021, Target Telephone 4 exchanged 72 communications with telephone number (865) 255-9911 (Target Telephone 3), a telephone used by ANDUJAR. Between September 4, 2021, and September 30, 2021, (865) 386-7769 exchanged 44 communications with telephone number (865) 255-9911 (Target Telephone 3). Based on my knowledge of this investigation ANDUJAR was one of G. CRUZ's main cocaine customers. I further believe that ANDUJAR would be more reluctant to drop his telephone because he used the same telephone number for his painting/renovation business. Between August 19, 2021, and August 28, 2021, Target Telephone 4 exchanged 43 communications with telephone number (865) 454-7240, a telephone identified as being used by an unknown female believed to be G. CRUZ's girlfriend. Between September 23, 2021, and October 3, 2021, (865) 386-7769 exchanged 24 communications with telephone number (865) 454-7240. Based on my training and experience even when an individual replaces their telephone, they will continue to maintain contact with their significant other. Between August 3, 2021, and September 3, 2021, Target Telephone 4 exchanged 30 communications with Target Telephone 5, used by O. CRUZ. Between September 6, 2021, and October 1, 2021, (865) 386-7769 exchanged 18 communications with Target Telephone 5. Below is a diagram referencing the aforementioned analyzed data regarding Target Telephone 4 and (865) 386-7769.



41.     Based on this information, I believe (865) 386-7769 was obtained as a replacement telephone for Target Telephone 4, used by G. CRUZ.  It is very common for drug traffickers to frequently change their telephones especially if someone associated to them is arrested.  Further, I believe drug traffickers change their telephones in order to avoid law enforcement detection because they believe that it is more difficult for law enforcement to intercept communications if the telephones and numbers are replaced periodically.  I believe this is why G. CRUZ changed his telephone and telephone number.

42.     Thus far, this investigation has shown that there is probable cause to believe that O. CRUZ has used and will continue to use Target Telephone 5 to facilitate the commission of the violations enumerated herein.  Thus, there is also probable cause to believe that wire and electronic communications over Target Telephone 5 will constitute evidence of the violations enumerated herein, and that the evidence will include the identities and roles of participants in an illegal controlled substance distribution and trafficking organization; the manner in which this

illegal controlled substance distribution organization operates; the identification of the illegal conduct; the identification of the nature and methods of the managing and financing of the controlled substance distribution organization; the locations of any controlled substance stash and controlled substance warehouses; the suppliers of the controlled substance; the identification and location of future controlled substance transactions; the identification of controlled substance distribution methods; the identification and location of evidence of controlled substance transactions, financial records and other records reflecting the occurrence of controlled substance transactions, and monies being used to finance and conduct the controlled substance transactions; and the identification of other individuals not yet identified who are participating in, directing, or deriving financial profit and benefit from the illegal controlled substance distribution business; and the identity of which telephone, telephones, and/or paging device or devices, if any, is or are being used by the targets of the investigation.

## VII.     ANALYSIS OF PHONE TOLL/PEN REGISTER INFORMATION

43.     On September 20, 2021, T-Mobile sent a subpoena compliance notice to DEA, stating that Target Telephone 5 is currently an active account. Based on records from T-Mobile, Target Telephone 5 is subscribed to "Oscar Cruz Rameriez," and has been an active account since December 26, 2020. As stated herein, it is believed that O. CRUZ is identified as being in possession of and utilizing Target Telephone 5.

44.     On September 22, 2021, United States Magistrate Judge Debra Poplin, Eastern District of Tennessee (EDTN), issued a court order authorizing the installation and use of a pen register for Target Telephone 5. Collection of call and text information began on September 23, 2021, and is currently being monitored by the KDO. Therefore all toll data/communications reflected in this document are complete.

45.     The toll record details for Target Telephone 5 showed that, between October 16, 2021 and November 17, 2021, Target Telephone 5 made or received approximately 666 telephone calls and 456 text messages.  Based upon my training and experience, drug traffickers make numerous short duration telephone calls.  Of the total 666 voice communications, 556 of those were 2 minutes or less in duration.  The following is an analysis of numbers in contact with Target Telephone 5 between October 16, 2021 and November 17, 2021.  The date range for this analysis indicated the date of the first and last exchange between that telephone number and Target Telephone 5.

| Telephone Number | Subscriber Information | Calls to/Calls from TT3 |
|---|---|---|
| A. (865) 386-7769 **Replacement phone for Target Telephone 4** | Jenna Madison 137 Holston Court, Apt 2 Knoxville, TN 37914 | 44 Total Contacts Between October 16 and November 17, 2021: 39 calls and 5 texts |

46.     Between October 16, 2021 and November 17, 2021, Target Telephone 5 made or received approximately 39 voice calls with phone number (865) 386-7769 (Replacement phone for Target Telephone 4), with the last call occurring on November 16, 2021.  Additionally Target Telephone 5 made or received approximately 5 text messages with phone number (865) 386-7769, with the last occurring on November 4, 2021.  Telephone number (865) 386-7769 is believed to be the replacement telephone for Target Telephone 4 used by G. CRUZ based on the following analysis.

| Telephone Number | Subscriber Information | Calls to/Calls from TT3 |
|---|---|---|
| B. (405) 414-7584 | Jorge Cardoza Gaytan 2517 W Glenhaven Drive, Apt 251 Oklahoma City, OK 73110 | 34 Total Contacts Between October 16 and November 17, 2021: 34 calls and 0 texts |

47.     Between October 16, 2021 and November 17, 2021, Target Telephone 5 made or received approximately 34 voice calls with phone number (405) 414-7584, with the last call occurring on November 17, 2021.  Telephone number (405) 414-7584 is believed to be used by Jorge CARDOZA.  In addition to telephone number (405) 414-7584 being subscribed to "Jorge Cardoza Gaytan", Knoxville Police Department also documented telephone number (405) 414-7584 as a number provided by Jorge CARDOZA during law enforcement interaction on April 5, 2018.  Furthermore, law enforcement financial transaction database showed (405) 414-7584 was listed on multiple money wire transfers as a contact number for Jorge CARDOZA.

| Telephone Number | Subscriber Information | Calls to/Calls from TT3 |
|---|---|---|
| C. (865) 209-1799 | Dolores Cruz<br>125 Tillery Road, Lot 40<br>Knoxville, TN 37912 | 14 Total Contacts Between October 16 and November 17, 2021: 14 calls and 0 texts |

48.     Between October 16, 2021 and November 17, 2021, Target Telephone 5 made or received approximately 14 voice calls with phone number (865) 209-1799, with the last call occurring on November 10, 2021.  Telephone number (865) 209-1799 is believed to be used by Dolores CRUZ.  In addition to telephone number (865) 209-1799 being subscribed to "Dolores CRUZ, Financial Crimes Enforcement Network (FinCEN) documents that D. CRUZ is registered as a Money Services Business (MSB) with (865) 209-1799 listed as a contact for D. CRUZ.

## VIII.   NEED FOR INTERCEPTION

49.     The original interception of the requested wire and electronic communications occurring over Target Telephone 5 is necessary because normal investigative procedures have been tried and have failed, appear reasonably unlikely to succeed if tried, or are too dangerous. These investigative procedures are detailed below.  Traditional methods of investigation will not

entirely accomplish the stated goal of the investigation, which include, but are not limited to, discovering: (a) the identities of all of the individuals involved in this drug trafficking and money laundering organization; (b) the exact roles of these various individuals; (c) the full identification and methods of operation of the persons providing narcotics to this organization; (d) the locations where members of the organization store their narcotics and drug proceeds; (e) the methods by which the members of this organization transport and distribute their narcotics; and, (f) the methods by which the organization's members launder, distribute, or conceal the assets acquired as a result of their illegal activities. Agents are particularly interested in discovering the involvement of O. CRUZ's associates, discovering the identities of O. CRUZ's source of supply, and his other customers. I believe interceptions of Target Telephone 5 will have the greatest probability of accomplishing all of the investigative goals along with the lowest risks of compromising the investigation before all of the goals are achieved.

50. It has been my experience that drug traffickers are careful about introducing outsiders to other members of the organization. They are also careful to limit and compartmentalize the knowledge that each member has about the organization. This prevents members, especially new members, from having enough information to do substantial harm to the organization in the event that they decide to cooperate with law enforcement. Moreover, once an investigation begins to focus on higher-level participants, such as O. CRUZ, the availability of viable investigative techniques correspondingly begins to shrink. That certainly is the case in this investigation.

51. Additionally, it is not uncommon for drug traffickers to "drop" or change, telephones for the purpose of evading electronic surveillance and to thwart law enforcement's

efforts to intercept their communications. Accordingly, it takes time and resources to identify the new telephones that the drug traffickers are using.

52. The following is a list of the investigation techniques that have been used to date, or that I have considered using in this investigation, along with an explanation as to why these techniques have not or are not likely to succeed in identifying the full nature and scope of this conspiracy.

## PHYSICAL AND ELECTRONIC SURVEILLANCE

53. Physical surveillance is an investigative technique that is used to confirm meetings between alleged conspirators, but often leaves law enforcement to speculate as to the purpose of the meetings. Although surveillance may confirm that meetings occurred, it does not provide the content of the conversation occurring at the meetings or the other activities occurring at the meetings. However, when physical surveillance is used in conjunction with the interception of communications, the meetings have additional significance because agents have access to the communication among the participants.

54. For example, on September 1, 2021, agents set up physical surveillance subsequent to an intercepted call between G. CRUZ using Target Telephone 4 (Target Telephone 4, Session #798) and an unknown male using Telephone (865) 415-7381 (UM-7381) agreed to meet at "the shop" for a suspected drug transaction. During the call UM-7381 told G. CRUZ that he wanted six, which I believe to mean six quantities of cocaine. G. CRUZ then told UM-7381 to give him 20 minutes and that he would meet him at "the shop," which I believe to be located at 210 E. Inskip Drive, Knoxville, Tennessee   Based on the intercepted call, I observed a small black 4 door vehicle pull into the front entrance of "the shop" and continue around to the back side of the building. I then observed a tan truck, matching the description of the truck G.

CRUZ has been seen in on previous occasions, pull into the entrance of "the shop" and park the vehicle. I observed G. CRUZ exit the driver side of his truck and walk toward the back of the shop and out of visual sight. A few minutes later, another agent was driving by "the shop" and observed G. CRUZ walking from the passenger side of the black vehicle toward G. CRUZ's truck. Immediately after the meeting, I observed the black vehicle pull out of "the shop" and turn left onto East Inskip Drive. I then observed the black vehicle turn right onto Central Avenue Pike. I was temporarily blocked by traffic as the black vehicle continued. The surveillance team attempted to locate the vehicle without success. Without the interception of the communications over Target Telephone 4, agents would not have known that G. CRUZ was meeting with a drug customer. Additionally, without intercepted communications agents would not have known that G. CRUZ utilized "the shop" to conduct drug transactions with UM-7381 and other drug customers.

55.     In light of the limitations, and as discussed in the initial affidavit filed in this matter, physical surveillance alone rarely succeeds in gathering sufficient evidence of the criminal activities under investigation. I still do not believe that extensive surveillance, even when combined with other normal investigative procedures, including electronic surveillance, would lead to complete identification of all members of the conspiracy. This is particularly true, I believe, for O. CRUZ's suppliers and his customers. Through a combination of physical and electronic surveillance, agents should be able to identify a variety of physical locations visited, or maybe even frequented, by O. CRUZ. Agents might even be able to associate a pattern of locations based on surveillance, particularly relative to known or suspected drug deliveries by O. CRUZ, to unidentified individuals. But, without the requested interceptions, agents still would have no way of determining the significance associated with each location visited by O. CRUZ.

Thus, surveillance is of limited value, particularly in controlled substance investigations where transactions often occur out of public view and at irregular times.

56.     Additionally, based upon my experience, extensive physical surveillance conducted in controlled substance investigations is often discovered by the subjects of the investigation, who are themselves conducting surveillance or counter-surveillance for law enforcement, competing drug dealers, and robbers. The discovery of surveillance by the subjects forces the immediate and abrupt termination of the surveillance and jeopardizes the entire investigation. Due to the nature of drug organizations, many drug traffickers carry weapons to protect their drugs and profits, which may make surveillance or other investigative techniques dangerous due to the close proximity of agents to the subjects involved in the illegal activity. Therefore, I believe that physical surveillance, in and of itself, would not succeed in meeting the goals of this investigation. Although surveillance is a valuable tool, it alone cannot provide the kinds of details that may be gleaned from criminal conversations between individuals involved in illegal activity. In addition, there is a risk of detection of future surveillance, which would irreparably damage the investigation.

57.     Despite the limitations of physical surveillance, agents have attempted to conduct surveillance on O. CRUZ. During the course of this investigation, it was discovered that O. CRUZ had an address of 2404 Capri Drive, Knoxville, Tennessee ("RESIDENCE") listed on his Tennessee driver's license. I conducted several checks of this residence, and on numerous occasions I observed a black Chevrolet Silverado ("BLACK TRUCK") bearing Tennessee Tag 9C2 0B8 (registered to Oscar CRUZ RAMIREZ, 2404 Capri Drive, Knoxville, Tennessee).

58.     On November 2, 2021 I and other officers conducted surveillance of the RESIDENCE. At approximately 6:29 A.M. I parked on a street near the RESIDENCE with a

view of the driveway of the RESIDENCE and I observed the BLACK TRUCK parked in the driveway. At approximately 7:10 A.M. I observed the lights come on of the BLACK TRUCK and the vehicle backed out of the driveway and then traveled South on Wilkerson Road and then turned left onto Merchant Drive. A short distance later, TFO Robert Howard started following the BLACK TRUCK which then drove through a yellow traffic light at the intersection of Merchant Drive and Clinton Highway. Surveillance vehicles were unable to make it through the intersection and lost sight of the BLACK TRUCK at approximately 7:12 A.M.

59.     At approximately 7:23 A.M. I located the BLACK TRUCK at 5015 Schubert Road, Knoxville, Tennessee backed in next to the carport of the residence. At approximately 8:00 A.M. TFO Jacob Wilson observed the BLACK TRUCK leaving 5015 Schubert Road traveling South. Surveillance vehicles briefly lost sight of the BLACK TRUCK. At approximately 8:01 A.M. TFO Nathan Stinnett observed the BLACK TRUCK traveling East on East Inskip Drive. At approximately 8:02 A.M. TFO Stinnett observed the BLACK TRUCK pull into the parking lot of Inskip Coin Laundry, 404 E Inskip Drive, Knoxville, Tennessee and park on the East side of the building. A moment later, I drove by this location and observed the BLACK TRUCK with a white truck parked beside it, but I could not tell if the driver of the BLACK TRUCK was meeting with anyone.

60.     At approximately 8:03 A.M. TFO Stinnett observed the BLACK TRUCK exit the parking lot of Inskip Coin Laundry, turning right onto East Inskip Drive. I then began following the BLACK TRUCK. I observed the BLACK TRUCK turn left onto Rowan Road and then left onto Merchant Drive. At approximately 8:07 A.M. I observed the BLACK TRUCK turn onto Interstate 75 traveling South and then exit onto Interstate 640 traveling east.

61.     At approximately 8:14 A.M. I observed the BLACK TRUCK exit Interstate 640, taking Exit 8 for Washington Pike, then turn right onto Washington Pike and another immediate right turn onto Valley View Drive. I observed the BLACK TRUCK continue West on Valley View Drive and then turn into the driveway of a residence, 4009 Valley View Drive, Knoxville, Tennessee at approximately 8:16 A.M. I was unable to maintain a visual of the BLACK TRUCK and drove by the residence.

62.     At approximately 8:17 A.M. Knox County Sheriff's Office ("KCSO") Detective Khristian Pickett observed the BLACK TRUCK exit 4009 Valley View Drive, Knoxville, Tennessee and turn left, traveling East on Valley View Drive, the same direction the BLACK TRUCK had initially come from. I followed the BLACK TRUCK a short distance, but discontinued surveillance because the BLACK TRUCK was slowing down and seemed to be driving in a manner of someone who was trying detect the presence of surveillance. At approximately 8:20 A.M. Detective Pickett observed the BLACK TRUCK turn around on Valley View Drive and start traveling West. All surveillance was then terminated.

63.     Based on the actions of O. CRUZ during surveillance, it is believed that O. CRUZ is aware of the possibility of law enforcement surveillance and drives in a manner to make it difficult to be surveilled. While this instance of surveillance was helpful toward the investigation in determining movements of O. CRUZ, continued and ongoing surveillance of the DTO would jeopardize the investigation and would not be fruitful to further discover the actions and activities of CRUZ and others involved in the DTO.

64.     A request for authority to collect real-time location information for Target Telephone 5 is included in the Application filed with this Affidavit. The requested location information for Target Telephone 5 will help agents identify locations frequented by O. CRUZ.

While that is important, the value of that information will be limited, because without the requested interceptions, agents will not know why O. CRUZ visits a particular location, who else is associated with that location, and what evidence might be found in that location. Concurrent interceptions often provide context to the significance of physical locations visited by drug traffickers, if not strong evidence of a particular location's purpose within the organization. Thus, as to Target Telephone 5, I believe the requested location information is likely to be valuable, but without the requested interception authority, it will be inadequate to achieve the goals of this investigation, even when combined with other, traditional law enforcement techniques.

65.     It also bears noting that telephone location information has inherent technological limitations. Most service providers, including T-Mobile, only provide location information once every 15 minutes. Most drug transactions occur in under 15 minutes. This limits the abilities of surveillance because normally by the time law enforcement arrives at the location the suspect was at, the suspect could have already departed and law enforcement has to wait a substantial amount of time for the next location. Also, location data received normally gives a number of meters regarding accuracy. It is common for locations received to indicate an accuracy of anywhere between 500 to 1500 meters, therefore even though you have a general location of your target, you may not be able to locate the target with the location information alone.

66.     For instance, during the interception of G. CRUZ on Target Telephone 4, intercepted communications often indicated G. CRUZ was meeting potential drug customers at "the shop," but at the time, agents did not know the location of "the shop." During these referenced intercepted communications, court ordered geo-location data gave agents a general area of location where Target Telephone 4 was located when G. CRUZ was discussing arriving

at "the shop," but without the court ordered authorized wire interceptions in conjunction with physical surveillance, agents would not have been able to ascertain the location of "the shop." When electronic surveillance is combined with intercepted communications and physical surveillance, it gives agents a better understanding of what the target of the investigation is doing at a specific location as well as assist in identifying customers and other members of the DTO.

## UNDERCOVER AGENTS AND COOPERATING SOURCES

67. CS-1, CS-2 and CS-3 have been used in this investigation and have been helpful in meeting some of the goals of the investigation. However, it has been my experience that drug traffickers are careful about introducing outsiders to other members of the organization. Even more important, they are careful to limit and compartmentalize the knowledge that each member, especially new members, has of the organization. This prevents members from having enough information to do substantial harm to the organization in the event that they decide to cooperate with law enforcement.

68. In this investigation, CS-1, CS-2 and CS-3 were instrumental in the establishment of the investigation into CAMPBELL and ultimately MARCANO ROMAN's and ANDUJAR's drug trafficking activities. However, neither CS-1, CS-2 nor CS-3 have been able to provide information of the organization beyond ANDUJAR. Agents used T-III intercepts to identify that MARCANO ROMAN obtained his cocaine from ANDUJAR and ANDUJAR obtained his cocaine from G. CRUZ, therefore, CS-1, CS-2 and CS-3's involvement in this investigation have been limited. No confidential sources have been established that are aware of O. CRUZ and his activities.

69. CS-4 has provided valuable historical information regarding O. CRUZ and the DTO. This information, while beneficial to the investigation, was strictly historical and did not

obtain current information relating to the DTO. Also based upon the arrest of CS-4 and the intercepted communications discussing the arrest of CS-4, it is apparent the members of the DTO would not be willing to communicate with CS-4 due to the concern CS-4 could be cooperating with law enforcement. Therefore, while CS-4's information was beneficial to the investigation, CS-4's cooperation or information would not lead to the ultimate goal of dismantling the DTO.

70.    In my experience with drug traffickers, I have seen that members of this type of organization are suspicious and unwilling to meet new individuals. At this point in the investigation, it is unlikely that additional confidential sources or an undercover agent ("UC") could successfully gain further information of the DTO. It has been my experience that drug traffickers are careful about interaction with individuals they do not know or introducing outsiders to other members of the organization. In my experience, drug trafficking members of this type of organization are very careful with whom they talk, and they are suspicious and unwilling to meet new individuals. Even if a UC is successfully introduced, members of this type of organization are careful to limit and compartmentalize the scope of the organization and the knowledge of new members so that new members cannot do substantial harm to the organization. Therefore, it is highly unlikely that a UC will be able to successfully infiltrate this organization and meet the full objective of the investigation.

## CONSENSUAL MONITORING

71.    There are no cooperative witnesses, confidential sources, undercover agents, or officers who have infiltrated the DTO on a level that can pro-actively provide the information and evidence necessary to dismantle the entire conspiracy. Although CS-1 has recorded numerous conversations with CAMPBELL to order and/or purchase drugs, and referenced drug transactions, these recorded conversations did not reveal any inner workings of CAMPBELL's

and MARCANO ROMAN's drug trafficking organization. CS-1's ability to continue contact with CAMPBELL or other members of the drug trafficking organization in this manner is limited, as recorded contacts have revolved around the purchase of drugs. Furthermore, continued cooperation from CS-1 will not establish the investigative goals of obtaining information regarding O. CRUZ's methods, activities and supplier, because CS-1 is not aware of O. CRUZ. It is unlikely further utilizing CS-1 will lead to introductions of others involved in the organization.

72.    CS-3 has established that he was conducting purchases of cocaine from ANDUJAR, however information obtained during the interview of CS-3 did not indicate that CS-3 had any knowledge of who ANDUJAR's supplier of cocaine was at the time. At the time CS-3 was interviewed, agents were not aware of the identity of any DTO members above ANUDAR in the DTO hierarchy, therefore CS-3 was not directly questioned regarding G. CRUZ or O. CRUZ. Therefore attempting to utilize CS-3 to purchase from ANDUJAR would not potentially lead to CS-3 gaining any information about G. CRUZ or O. CRUZ or being introduced to either individual. Based on my training and experience, it is common for individuals who sell narcotics to keep the identity of their supplier a secret and it would be extremely unlikely that ANDUJAR would ever introduce CS-3 to G. CRUZ in order for CS-3 to potentially make contact with O. CRUZ. Therefore, utilizing CS-3 in this investigation would not be a viable alternative to the interception of wire and electronic communications requested herein.

## INTERVIEWS

73.    Other than confidential sources, agents have not had the opportunity to interview any other members of the DTO. As mentioned previously, TBI conducted interviews of CS-4

who gave information regarding his knowledge and involvement of this DTO. While this was helpful, intercepted communications over Target Telephone 4 indicated members of the DTO were aware of the arrest of CS-4 and were concerned with the possibility that CS-4 would cooperate with law enforcement. The mere knowledge of CS-4's arrest caused members of the DTO to alter their activities and threatened to impede the investigation. While the information CS-4 gave was valuable to the investigation, CS-4 was only able to provide limited historical information regarding the DTO, as it pertained to G. CRUZ and O. CRUZ. The fact that CS-4 had not been associated with the DTO for some time, CS-4 could not provide any current or real time information that would assist agents in dismantling the DTO.

74.     I believe that any attempt to interview additional members of the DTO at this time in the investigation would be premature, and would not be productive. In fact, the use of interviews is more likely to harm the investigation than to further it because interviews would alert the members of the conspiracy to the ongoing investigation, making the investigation more difficult and dangerous. In addition, those individuals engaged in illegal conduct would most likely refuse to participate in interviews, or would minimize their involvement with the DTO.

## MAIL COVERS

75.     United States Postal Inspection Service (USPIS) has assisted and are a participating agency in this investigation. USPIS has conducted multiple mail covers for the target subjects. A mail cover does not record the identity of all correspondence to the listed address because there are private carriers that may drop off packages that are not subject to the mail cover. Therefore, the mail covers have been of limited use in this investigation. Furthermore, this type of evidence does not specify the roles and participation in the conspiracy of the persons sending correspondence to the target locations. The mail covers have provided

leads for agents to further investigate. The mail covers obtained have not provided the necessary investigative detail necessary to accomplish the goals of the investigation.

## SEARCH WARRANTS

76.     Search Warrants are an investigative tool that can provide valuable evidence. During the course of this investigation, CS-1 was utilized to conduct controlled purchases of suspected cocaine from Ronnie CAMPBELL JR. at his residence located at 2709 Tecoma Drive, Knoxville, TN. During these transactions, Marcos MARCANO ROMAN would deliver the suspected cocaine directly to CS-1, with CAMPBELL acting as a broker. While these transactions would provide ample evidence for a search warrant of this residence, it would not provide the evidence needed to completely dismantle the DTO and would alert the DTO of the ongoing investigation.

77.     During the investigation, agents identified a residence of Marcos MARCANO ROMAN, as 4000 Pleasant Ridge Road, Apartment B4, Knoxville, TN. During the interception of MARCANO ROMAN's phone (Target Telephone 2) interceptions indicated that MARCANO ROMAN would leave his residence and distribute suspected cocaine in parking lots of gas stations and other locations. Therefore it is not likely the execution of a search warrant at this location would lead to the dismantling of the DTO and would alert the DTO of the ongoing investigation.

78.     During the investigation, agents identified two residences associated with Ivan ANDUJAR, 914 Green Ridge Circle, Knoxville, TN and 3315 Old Midway Road, Lenoir City, TN. It is believed ANDUJAR does not reside at 914 Green Ridge Circle, but rents the residence out to other individuals. No information has been received which would indicate ANDUJAR stores money or cocaine at 914 Green Ridge Circle, therefore a search warrant of this location is

not possible. It is believed that ANDUJAR resides at 3315 Old Midway Road. During the interception of ANDUJAR's phone (Target Telephone 3), interceptions have indicated that ANDUJAR may keep suspected cocaine at 3315 Old Midway Road, but it is not known if this is the main location where ANDUJAR stores cocaine. Therefore it is not likely the execution of a search warrant at this location would lead to the dismantling of the DTO and would alert the DTO of the ongoing investigation.

79. Furthermore, potential search warrants of locations associated to CAMPBELL, ROMAN and ANDUJAR, would not lead to the ultimate goal of dismantling the DTO because these individuals are below G. CRUZ and O. CRUZ in the hierarchy of the DTO.

80. During the investigation, agents identified a residence associated with G. CRUZ, 125 Tillery Drive, Lot 19, Knoxville, Tennessee. While it is believed that G. CRUZ resides at this location, it is not known if G. CRUZ maintains large quantities of cocaine at the residence. During the interception of G. CRUZ's phone (Target Telephone 4), interceptions never indicated G. CRUZ would meet individuals at this location nor would G. CRUZ distribute cocaine directly from this location. Therefore it is not likely the execution of a search warrant at this location would lead to the dismantling of the DTO and would alert the DTO of the ongoing investigation.

81. During the investigation, agents identified a location associated with multiple members of the DTO, Xfire, 210 East Inskip Drive, Knoxville, Tennessee. Initially this location was discovered based upon surveillance conducted of G. CRUZ and ANDUJAR meeting at this location. Subsequent surveillance has observed O. CRUZ and other DTO members at this location, but it is not believed quantities of cocaine are stored at this location, but believed this location is merely a common meeting spot of the members of the DTO. The majority of the meetings observed at this location occurred in the parking lot and not inside the building.

Therefore it is not likely the execution of a search warrant at this location would lead to the dismantling of the DTO and would alert the DTO of the ongoing investigation.

82.     During the investigation, agents identified a location associated with G. CRUZ, El Zocalo Mexican Store, 429 Dutch Valley Drive, Knoxville, Tennessee. On one occasion during this investigation, after a meeting between G. CRUZ and ANDUJAR, G. CRUZ was observed going to this location immediately after meeting ANDUJAR. It is believed a possible relative of G. CRUZ, Dolores CRUZ, is employed at this business. At this point in the investigation, it is not known what role this business may be performing for the DTO. At this time it is not suspected cocaine controlled by the DTO is stored at this business. Therefore it is not likely the execution of a search warrant at this location would lead to the dismantling of the DTO and would alert the DTO of the ongoing investigation.

83.     During the investigation, agents identified a residence associated with multiple members of the DTO, 5015 Schubert Road, Knoxville, Tennessee. During separate surveillance operations, different members of the DTO have been observed going to this residence, to include O. CRUZ. Based upon interceptions of Target Telephone 4 (G. CRUZ's telephone), it is suspected the DTO is utilizing this residence to store suspected cocaine. After the events of September 2, 2021, when G. CRUZ and O. CRUZ learned of CS-4's arrest and discussed relocating the stash locations for money and drugs, it is not known if the DTO is still utilizing this address as a stash location, but agents have observed G. CRUZ, O. CRUZ and other unknown individuals go to this location. While a search warrant at this residence could lead to a seizure of a quantity of cocaine from the DTO, it would not lead to the complete dismantling of the DTO and would alert the DTO of the ongoing investigation.

84.     During the investigation, agents identified a residence associated with multiple members of the DTO, 702 Henrietta Drive, Knoxville, Tennessee.  During surveillance operations different members of the DTO have been observed going to this residence.  It is believed a relative of the DTO members live at this residence.  Further based upon interceptions of Target Telephone 4 (G. CRUZ's telephone), specific communications between G. CRUZ and O. CRUZ indicate this residence may be used for the storage of monetary proceeds from the sale of cocaine.  Communications discussing the arrest of CS-4 indicated the DTO were intending to move the currency kept at this location, but G. CRUZ stopped using Target Telephone 4 therefore it is not known if this location is still being used to store currency.  However, agents have continued to observe vehicles registered to G. CRUZ and O. CRUZ at this residence. Therefore it is not likely the execution of a search warrant at this location would lead to the dismantling of the DTO and would alert the DTO of the ongoing investigation.

85.     During the investigation, agents identified an address associated with O. CRUZ, 2404 Capri Drive, Knoxville, Tennessee.  This address was discovered to be listed on the Tennessee drivers license of O. CRUZ.  As previously stated, I have observed a vehicle at this residence registered to O. CRUZ.  At this point in time, I believe O. CRUZ resides at this location, but I am not aware if the DTO is using this location for any other activities.  Therefore it is not likely the execution of a search warrant at this location would lead to the dismantling of the DTO and would alert the DTO of the ongoing investigation.

86.     In my experience, the most successful search warrants are done at the end of the investigation once each co-conspirator has been completely incriminated.  It is my belief that it would be more productive to execute search warrants at the end of the investigation, once the

stated goals of the investigation have been substantially achieved and there is a better chance of dismantling this organization.

## TRASH SEARCHES

87.     An investigative technique that sometimes provides valuable evidence is a "trash search" or the collection and examination of discarded trash at a subject's residence. Agents have considered doing trash searches in this case. One location identified in the investigation is the residence of CAMBELL, 2709 Tecoma Drive, Knoxville, Tennessee. The location where CAMPBELL resides at has multiple dogs at the residence, which would likely alert CAMPBELL to someone near his residence. Also, a trash search at this residence would not achieve the ultimate goal of dismantling the DTO and would risk the investigation.

88.     Another location identified in the investigation is the residence of MARCANO ROMAN, 4000 Pleasant Ridge Road, Apartment B4, Knoxville, Tennessee. This residence is in an apartment complex which utilizes community trash receptacles. In order to conduct a trash search, surveillance would need to be conducted over a time period to try and identify trash discarded by MARCANO ROMAN. This would not be practicable and furthermore it would not lead to the ultimate goal of dismantling the DTO, nor would it be likely to lead to evidence of other individuals in the DTO.

89.     Agents have discovered two locations associated with ANDUJAR. 914 Green Ridge Circle, Knoxville, TN and 3315 Old Midway Road, Lenoir City, TN. As stated previously, it is believed ANDUJAR rents 914 Green Ridge Circle and does not live at the address. Therefore a trash search of this residence is unlikely to lead to any evidence which would further the investigation. It is believed that ANDUJAR resides at the other residence, 3315 Old Midway Road. Surveillance conducted of the residence does not indicate if

ANDUJAR has trash pickup service at this residence. Also the residence is located in a rural residential area, posing a significant risk to law enforcement attempting a trash search. Even if a trash search was possible, it would not accomplish the goal of dismantling the DTO and could alert other members of the DTO to the ongoing investigation.

90.     Another location identified in the investigation is the residence of G. CRUZ, 125 Tillery Drive, Lot 19, Knoxville, Tennessee. This location is in a densely populated trailer park. Initially I believed the residents of this location potentially used a community dumpster for trash disposal, but after further surveillance, I observed a trash can located at this residence potentially used for trash service. The trash can was located near the road, but it was within close distance to the residence and within easy view of many of the residences located nearby. Therefore a trash search would not be practicable and furthermore it would not lead to the ultimate goal of dismantling the DTO, nor would it be likely to lead to evidence of other individuals in the DTO.

91.     Members of the DTO have been surveilled at two locations which are businesses, Xfire, 210 East Inskip Drive and El Zocalo Mexican Store, 429 Dutch Valley Drive, both located in Knoxville, Tennessee. At the present time I am not aware if these are merely locations that DTO members meets individuals at or if the DTO is utilizing these locations for other purposes. While trash searches may be feasible at these locations, it is suspected that the majority of the trash at these locations could merely be associated with the business and without further information regarding the DTO and their association with these businesses, trash pulls could merely jeopardize the investigation and would not lead to the goal of dismantling the DTO.

92.     Another location identified in the investigation is a residence, 5015 Schubert Road, Knoxville, Tennessee. During the course of this investigation, intercepted communications have led me to believe this location is used by the DTO to store quantities of

cocaine for distribution. It does not appear that anyone lives at the residence, and it is not known if trash service is used at this location. Even if a trash search was possible at this location, it is unlikely the search would be productive in leading to information that could dismantle the DTO and it could merely jeopardize the investigation.

93.     Another location identified in the investigation is a residence, 702 Henrietta Drive, Knoxville, Tennessee. Based upon intercepted communications, I believe a relative of O. CRUZ lives at this residence and I also believe the DTO was at one point using this residence to store currency gained from the distribution of cocaine. On previous surveillance, I have observed a trash can at this residence in the driveway. While a trash search may be feasible, I do not believe any of the main members of the DTO reside at this residence, therefore a trash search would not likely lead to information that could dismantle the DTO.

94.     Another location identified in the investigation is believed to be the residence of O. CRUZ, 2404 Capri Drive, Knoxville, Tennessee. On occasions that I have observed the residence, I have seen a trash can in the driveway of the residence. As previously stated, on November 2, 2021 I and other task force officers conducted surveillance of this residence with two goals; to conduct surveillance of O. CRUZ and attempt a trash search at this location. After a vehicle registered to O. CRUZ left the residence, KCSO Detective Khristian Pickett went by the residence to see if a trash search was possible. Detective Pickett observed the trash can was no longer near the street as I had observed on previous occasions and had been relocated near the house. Also Detective Pickett believed he observed a door bell camera located at the residence. Due to the fact of the location of the trash can and the potential for surveillance cameras at the residence, it was determined that a trash search would more than likely jeopardize the

investigation and it is not known if any information obtained from a trash search would lead to the dismantling of the DTO.

95.     It is not likely that a criminal case could be made against the DTO based on evidence from trash searches alone. Successful and competent DTO's like this one will likely be very cognizant of the trash they discard and ensure that drug trafficking materials and supplies are disposed of in a private and discreet way. Additionally, as with other means of investigation, trash searches can only be done on suspects whose home address is known.

## GRAND JURY SUBPOENAS

96.     At this stage of the investigation, I believe issuing grand jury subpoenas to the Target Subjects, or other individuals believed to be either involved in this conspiracy or associated with those involved, would not result in achieving the stated goals of this investigation. The Target Subjects and their associates, should they be called to testify before the grand jury, would likely be uncooperative, lie, or invoke their Fifth Amendment privilege to not testify. It is not reasonable to believe that the Target Subjects would agree to incriminate themselves under oath because the potential penalties would be too severe.

97.     Additionally, issuing grand jury subpoenas would have the effect of alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence.

98.     Grants of immunity would not be appropriate at this state of the investigation because immunity could foreclose the prosecution of principal members of this conspiracy and would not ensure the receipt of truthful testimony before the grand jury. As with grand jury subpoenas, it is not logical to believe that the Target Subjects would agree to incriminate themselves even if presented with the possibility of immunity. In my experience, this technique

is more successful at the end of the investigation when the Target Subjects would possibly choose to provide information or cooperate to reduce their sentences.

99.     There is no basis to believe that the use of grand jury subpoenas or immunity is currently feasible in this case, and no grand jury subpoenas have been issued to members of the DTO. For the foregoing reasons, use of grand jury subpoenas and immunity is unlikely to advance the government's investigative objective.

100.     Agents are working to identify additional banks and financial institutions used by the Target Subjects, if any, to issue Grand Jury subpoenas for records. However, though this information, once received, is anticipated to assist in the investigation, it will not be sufficient to achieve all the goals of the investigation.

## TELEPHONE TOLL RECORDS, PEN REGISTERS, AND TRAP/TRACE DEVICES

101.     The use of toll records has proven to be beneficial in this investigation. Data derived from the analysis of toll records has assisted law enforcement officers in identifying some of the telephone numbers that are in contact with the aforementioned Target Telephone 1, Target Telephone 2, Target Telephone 3, Target Telephone 4 and Target Telephone 5. Toll analysis of the phones used by MARCANO ROMAN, ANDUJAR, G. CRUZ, O. CRUZ and other members of the DTO show they are in contact with multiple individuals believed to be involved in this organization. However, this information has been limited in that telephone records do not record the identity of the parties to the conversation, do not identify the nature or substance of the conversation, and do not differentiate between legitimate calls and pertinent criminal activity calls. Specifically pen registers and toll records cannot indicate the time, place, or manner of delivery of controlled substance, or the methods of transportation and distribution of controlled substances. Nor does this type of evidence specify the roles and participation of the

persons initiating or receiving the telephone calls in the transportation and distribution network of which the Target Interceptees are a part. At best, such evidence provides contact between telephone numbers subscribed to by certain people.

102. On December 3, 2020, United States Magistrate Judge Debra Poplin, EDTN, issued court orders authorizing the installation and use of pen registers for Target Telephone 1 and Target Telephone 2. Collection of call and text information over Target Telephone 2 began on December 4, 2020. Collection of call and text information over Target Telephone 1 began on December 9, 2020. Toll records have been compiled from both the pen register and from records requested from Verizon Wireless and AT&T. The pen register for Target Telephone 2 was renewed on January 29, 2021, and continued to receive data through the expiration of the T-III intercept of Target Telephone 2.

103. On April 7, 2021, United States Magistrate Judge Debra Poplin, EDTN, issued a court order authorizing the installation and use of a pen register for Target Telephone 3. Collection of call and text information began on April 8, 2021 and continued through June 5, 2021. Additionally, on June 22, 2021, a court order authorizing the continued use of a pen register for Target Telephone 3 was signed by United States Magistrate Judge H. Bruce Guyton, EDTN. Toll records have been compiled from both the pen register and from records requested from T-Mobile. With the activation of the prior interceptions, the pen/trap information for Target Telephone 3 continued through August 13, 2021.

104. On July 21, 2021, United States Magistrate Judge Debra Poplin, EDTN, issued a court order authorizing the installation and use of a pen register for Target Telephone 4. Collection of call and text information began on July 22, 2021 and continued through the expiration of the T-III intercept of Target Telephone 4 on September 12, 2021. These records

indicated that Target Telephone 4 was no longer used to make outgoing calls or text after September 3, 2021. This information led agents to analyze the frequent contacts of Target Telephone 4 which led to the identification of telephone (865) 386-7769, believed to be a replacement phone for Target Telephone 4.

105. On September 22, 2021, United States Magistrate Judge H. Bruce Guyton, EDTN, issued a court order authorizing the installation and use of a pen register for Target Telephone 5. Collection of call and text information began on September 23, 2021 and continued to be monitored at the current time. Records indicate approximately 59% of the communications over Target Telephone 5 are calls and 41% of the communications are text messages. Of the calls over Target Telephone 5 approximately 83% are less than two minutes in duration. Furthermore a majority of communications (approximately 88%) are completed between 7:00 a.m. and 11:00 p.m.

106. The identification of subscriber information for some of the numbers in communication with the aforementioned phones is of limited value to this investigation because it is common practice for persons involved in illicit drug trade to use fictitious names or account information, and often do not convey the actual user of the telephone. Though the utilization of toll record analysis is a tool used in establishing communications between members of this organization, these records alone have not assisted in identifying all members, associates, customers, stash locations, or methods of operation used by this organization.

107. To gather sufficient evidence to support a prosecution, it is necessary to know the contents of the calls and texts. Agents need to intercept Target Telephone 5 to discover who O. CRUZ talks to and what they talk about. That will assist agents in learning the true identities of additional drug traffickers, the nature and scope of the organization, the roles of the various

participants in the organization, the sources of supply of the narcotics, the locations of new and additional stash houses for narcotics, the method of distributing the narcotics, and the methods and means of distributing and concealing the assets acquired from the organization's drug trafficking activities. Further, the contents of the conversations would aid me in conducting surveillance and in obtaining search warrants when they would be beneficial and appropriate.

## FINANCIAL INVESTIGATION

108.    I have not obtained tax returns or credit reports for any of the members of the DTO. Although obtaining tax returns, credit reports, or other financial information may be helpful in tracing illicit proceeds collected by the Target Subjects, it is highly unlikely that the information will lead to the identification of other members of the conspiracy. Nevertheless, agents have run financial database checks on several members of the DTO. The KDO conducted queries of a law enforcement financial database, in which G. CRUZ was identified as making five wire money transfers to individuals in Mexico, in the amounts of $2,000 and below. Additionally, G. CRUZ provided telephone (865) 978-3261 (Target Telephone 4) as his contact telephone through each transaction, with the most recent having occurred in June of 2021. Although the justification for these transactions, or the relationship to the recipients, remains unknown, based on this investigation, agents do not believe G. CRUZ has legitimate, gainful employment within the state of Tennessee.

109.    Additionally, CARDOZA was identified as making three wire money transfers to individuals in Mexico and Georgia, totaling $2150. On those transactions, CARDOZA provided telephone number (405) 414-7584 as his contact telephone through each transaction, with the most recent having occurred in October of 2020. D. CRUZ was identified as making seven wire money transfers to individuals in Mexico, totaling approximately $4500. On those transactions,

D. CRUZ provided telephone number (865) 209-1799 as her contact telephone through each transaction, with the most recent having occurred on September 29, 2021.

110. On June 29, 2021, DEA subpoenaed Western Union Financial Services, Inc., as well as Money Gram International, in request of transactional information in which MARCANO ROMAN, ANDUJAR, RODRIGUEZ and/or ROMAN were the sender and/or payee, during the time period of the T-III intercepts occurring within this investigation. DEA received subpoena compliance from both Western Union Financial Services, Inc. and Money Gram International, however there were no results for the requested time period of the subpoena.

111. DEA also conducted queries of Bank Secrecy Act (BSA) data held by the Financial Crimes Enforcement Network (FinCEN), with regard to identified members of this organization. No identifiable, significant currency transactions were documented through required reporting through the BSA. However, Agents learned through FinCEN that D. CRUZ is a registered owner or controlling person of a Money Services Business (MSB) identified as a Money Transmitter at 429 Dutch Valley Drive, Knoxville, Tennessee.

112. Previously, in 2020, DEA had subpoenaed WU and RIA Financial Services in request of transactional records pertaining solely to MARCANO ROMAN. The results of these requests identified that MARCANO ROMAN had routinely sent money wire transfers to persons located in Puerto Rico and the Dominican Republic. These transactions, as documented within this investigation, totaled approximately $8,000 USC sent by MARCANO ROMAN via these methods in a four-month period. Through intercept of Target Telephone 2, this investigation has determined that these transactions, by MARCANO ROMAN, were issued to family members and submitted as payment for child support. Although money wire transfers and other money transactions are helpful in a drug conspiracy investigation to identify money laundering and

other individuals conspiring with the DTO, these transactions alone do not meet the goal of the investigation. Based on information learned during this investigation, I believe this DTO moves a majority of their drug proceeds as bulk cash and not through money wire transfers. In my experience, drug traffickers normally conduct business on a cash basis and often do not use traditional banking methods. Based on my experience, I also know drug traffickers normally either do not file income tax returns or file false income tax returns and/or place assets in the names of other persons to prevent them from being located and identified. Therefore, any tax returns obtained may provide only minimal insight into the actual financial activities of the Target Subjects. At best, a financial investigation of a drug trafficker can serve to confirm the existence of unexplained wealth or unusual financial transactions. However, absent the use of other investigative methods, simply obtaining financial information cannot achieve the goals of this investigation.

113. Additionally, in my experience, drug traffickers often use other persons' names to open accounts, conduct wire transfers, or open businesses in order to conceal their illegal operations. Furthermore, drug traffickers usually do not trust or discuss their financial endeavors with their drug customers or even their drug suppliers. Even if agents were able to identify all accounts, businesses, and money laundering schemes used by this DTO, it would not provide the full organizational detail necessary to accomplish the goals of the investigation.

114. Many members of the DTO remain unidentified, including many of the people to whom O. CRUZ is distributing narcotics. Therefore, I believe financial information gained through this investigation will be most useful in corroborating evidence obtained through other means after all of the organization's co-conspirators have been identified.

115. In addition to money wire transfers, agents have also identified multiple real properties that have been used by the DTO to facilitate their distribution of cocaine. (1) 702 Henrietta Drive, Knoxville, TN, was identified as a stash house for monetary proceeds from drug transactions: According to the Property Assessor's Office is owned by Jhonathan CRUZ-RAMIREZ. During surveillance and intercepted communications agents learned this residence was referred to as "Grandma's House" and was used to stash drug proceeds. According to Zillow, this residence is worth $139,900.00. The sale price, according to the Property Assessor's Office was $50,000 on December 24, 2019. (2) 5015 Shubert Road, Knoxville, TN, was identified as a drug stash house for the DTO. According to the Property Assessor's Office is owned by O. CRUZ, Carmen CRUZ-HERNANDEZ, and Anaelsa CARDOZA-CANALES. During surveillance and intercepted communications agents learned this residence was referred to as "the little House" and was used to stash suspected cocaine. On at least one occasion, agents observed G. CRUZ go to the residence prior to distributing cocaine to a drug customer. Agents have also observed ANDUJAR, O. CRUZ, and A. CRUZ at the residence on multiple occasions. Based on surveillance, it is not believed anyone actually lives at this residence. According to Zillow, this residence is worth $155,400. The sale price, according to the Property Assessor's Office was $61,600 on October 20, 2016. Although these properties are believed to be used by the DTO to further their drug conspiracy, it is unknown how members of the DTO acquired the properties or how all the individuals associated to the properties may or may not be involved with the drug activities of the DTO. Therefore, I believe real property information gained through this investigation will be most useful in corroborating evidence obtained through other means after the investigation is complete.

116.    I will continue to make efforts to use conventional investigative methods, such as physical surveillance, confidential informants, pen registers, and financial information to further this investigation.  However, the only viable means to neutralize a criminal entity is to focus on its communications.  Communications is the lifeblood of a criminal organization, and therefore, to fully understand it and effectively dismantle it in its entirety, one must actively participate in its thought processes through the interception of its communication.  A very effective method to investigate a criminal organization in its entirety is the Court-authorized interception of the communications utilized by members of the organization to command and control the operations conducted in furtherance of their ongoing criminal enterprise.

117.    I believe that the authorization for wire and electronic communications interception, as discussed herein, would provide information identifying the full nature, extent, and volume of the drug trafficking activities of the DTO.  Although some co-conspirators have been identified, there is probable cause to believe that many others are involved, including individuals responsible for transporting, warehousing, and distributing the narcotics and/or the proceeds derived from their sale.

118.    The requested wire and electronic communications would likely produce information assisting investigators in the identification of smugglers, transporters, coordinators, and financiers involved in the distribution of narcotics, the individuals responsible for maintaining locations used to warehouse narcotics, the seizure of physical evidence, the identity of illegally obtained and therefore forfeitable assets, the identification and apprehension of other conspirators, the obtaining of incriminating communications between conspirators in furtherance of the conspiracy, and the conviction of the violators.

119.     The requested interceptions, conducted in conjunction with physical and electronic surveillance, and the execution of search warrants, will likely result in the necessary evidence to convict a large number of the co-conspirators involved and successfully dismantle the organization.  Without the requested interception, the traditional investigative techniques being employed would likely only either compromise the investigation prematurely or result in the conviction of only a limited number of subjects, thus the DTO would not be completely dismantled and would probably continue to engage in illicit activities by recruiting new members into the organization.

## PRIOR INTERCEPTIONS

120.     During prior court-authorized interceptions, agents gained knowledge of the cocaine drug trafficking activities of CAMPBELL, MARCANO ROMAN, ANDUJAR, and G. CRUZ.  During the interceptions of Target Telephone 1 agents learned that CAMPBELL distributed cocaine to multiple customers and was supplied cocaine by MARCANO ROMAN.  During the interceptions of Target Telephone 2 agents learned that MARCANO ROMAN had multiple cocaine customers and obtained the cocaine from ANDUJAR.  During the interceptions of Target Telephone 3 agents learned that ANDUJAR had multiple cocaine customers and obtained cocaine from G. CRUZ.  During the interception of Target Telephone 4 agents learned that G. CRUZ had multiple cocaine customers and coordinated supply and deliver of cocaine with O. CRUZ.  Furthermore G. CRUZ and O. CRUZ regularly communicated with each other about cocaine as described herein.  The goal of this investigation is to identify the supply chain of the cocaine into the Eastern District of Tennessee, other co-conspirators responsible for the supply and distribution of cocaine, and methods of money laundering used by the organization. Based on interceptions of wire communications of Target Telephone 4, agents believe O. CRUZ

coordinates the actual supply and delivery of cocaine for himself and G. CRUZ who further distributes the cocaine to multiple customers. At this time, agents do not know the means of O. CRUZ's cocaine supply and believe the interception of Target Telephone 5 will assist agents with the goals of this investigation. Thus, the prior interceptions, even combined with the other evidence gathered to date, failed to achieve the stated goals of this investigation.

121. Therefore, I believe interception of the requested communications over Target Telephone 5, are necessary, and permission is hereby requested to intercept wire and electronic communications of the Target Interceptees.

## DURATION OF INTERCEPTION

122. This Affidavit is in support of an Application to intercept wire and electronic communications to and from Target Telephone 5 until the attainment of the authorized objectives or, in any event, for a period not to exceed 30 days. It is requested, pursuant to 18 U.S.C. § 2518(5), that the 30-day period be calculated from the day on which investigative or law enforcement officers first begin to conduct an interception under the Order sought, or ten days after the Order is entered, whichever is earlier.

123. The authorization given is intended to apply not only to the Target Telephone number listed above, but also to any other telephone number subsequently assigned to or used by the instrument bearing the same international mobile equipment identification number ("IMEI") used by Target Telephone 5, within the thirty-day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

124.     As demonstrated by the facts contained in this Affidavit, the drug trafficking and money laundering conspiracy identified is on-going and involves the Target Interceptees. This investigation seeks to identify the full scope, membership, and method of operation of the conspiracy. Therefore, I request that interception not be ordered terminated upon the first interception of a conversation regarding narcotics trafficking or money laundering, but be allowed to continue until the full scope of the conspiracy, the persons involved, and their respective roles are determined, or for 30 days, whichever comes first.

## IX.     MINIMIZATION

125.     All communications intercepted over Target Telephone 5 will first be listened to or read and minimized at the DEA office in Knoxville, Tennessee.

126.     The requirements regarding the minimization of interception will be strictly followed. Before initial interception begins, a meeting will be held for all monitoring agents and civilian contract personnel wherein the requirements of minimization will be discussed. Any monitoring agents and civilian contract personnel not in attendance will be instructed on the requirements of minimization at a later time prior to their involvement in any monitoring activity. A memorandum regarding minimization will be provided to all monitoring agents/contract personnel as well as a copy of the Court's Order authorizing interception. A copy of that Order and a minimization memorandum will remain posted at the listening site. Before agents/contract personnel begin to intercept communications, the agents/contract personnel will be required to sign a form indicating that the agents/contract personnel have read this Affidavit, the Court's Order authorizing interception, and the minimization memorandum and that the agent/contract personnel are familiar with the contents of the Order and will intercept wire

communications in compliance with that Order. Special attention will be paid to minimizing privileged communications.

127.     All wire communications will be minimized in accordance with Chapter 119 of Title 18, United States Code, and all intercepts conducted pursuant to this Court's Order will terminate upon the authorized objectives or, in any event, at the end of thirty (30) days measured from the earlier of the day on which law enforcement officers first begin to conduct an interception under the Court's Order or ten (10) days after the Order is entered. Interception will be suspended immediately when it is determined, through voice identification, physical surveillance or otherwise, that none of the target subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined, during the portion of the conversation already overheard, that the conversation is criminal in nature. Even if one or more of the target subjects or their confederates, when identified, is a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or not otherwise related to the criminal offense.

128.     Likewise, all monitoring of electronic communications (text messages) will also be conducted in accordance with Chapter 119 of Title 18, United States Code. Each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team. If a text message appears to be relevant to the

investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation. If a text message is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the court upon the expiration of the court's order authorizing the interception. It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read. However, even when unmanned, the monitoring location will be kept secure with access limited to only authorized monitoring personnel and their supervising agents.

129.     Electronic communications over Target Telephone 5 will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 et seq., in part through receipt from the service provider of "packet data," an electronic data stream. That packet data stream, pursuant to CALEA, will be delivered to DEA's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone. Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through DEA's wire communications collection system and minimized in real-time. The packet data, including the copies of voice calls, cannot be minimized in real-time. Therefore, DEA will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls (which are wire communications) from being intercepted by filtering them out of the electronic communications packet data stream before they enter the electronic communications collection system and are recorded. In the rare

event that a voice call is not filtered out of the packet data stream and is recorded, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and DEA will preserve and seal such communications in the manner used for other intercepted electronic communications. As officers, deputies, investigators, and agents from state and local agencies may participate in this investigation, and their further participation would aid this investigation, it is requested that they be authorized to assist the DEA agents in conducting this electronic surveillance, as provided by 18 U.S.C. §§ 2517(1) and 2517(2). In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

130. All intercepted wire and electronic communications will be recorded and all recordings will be securely preserved. Computerized logs will be prepared regarding the date, time of calls/communications, the parties involved, the subject of the calls, and if and when minimization occurred. A report detailing the course of the interception will be filed with the Court on or about the fifteenth (15th) and thirtieth (30th) day following the commencement of interception, pursuant to the Order. Particular emphasis will be placed on reporting minimization efforts as well as the need for the continued wire and electronic intercepts to the Court.

131. Because officers, deputies, investigators, and agents from state and local agencies may participate in this investigation, and their further participation would aid this investigation, it is requested that they be authorized to assist the agents in conducting this electronic surveillance, as provided by Title 18, United States Code, Sections 2517(1) and 2517(2). In the event an intercepted communication is in a code or foreign language, and an expert in that

foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

132.    Based on my experience, and that of other agents who have monitored and supervised wire and electronic interceptions, I believe that many drug related conversations may be part of an otherwise seemingly innocent conversation. Thus, lengthy conversations that appear to be non-pertinent will be periodically monitored to determine if the conversation has become criminal in nature.

## X.    CONCLUSION

133.    I believe that the facts alleged herein establish that O. CRUZ and individuals associated with his drug trafficking organization are engaged in an ongoing drug trafficking business and that evidence sought will be intercepted on a continuing basis following the receipt of authorization to intercept the particular communications that are the object of this request. Therefore, it is requested that the interceptions not be required to terminate when the communications described herein are first intercepted, but be allowed to continue until communications are intercepted which fully reveal the scope of the enterprise, including the identities and roles of participants in the above-described illegal controlled substance distribution and trafficking organization; the manner in which this illegal controlled substance distribution organization operates; the identification of the illegal conduct; the identification of the nature and methods of the managing and financing of the controlled substance distribution organization; the locations of any controlled substance stashes and controlled substance warehouses; the suppliers of the controlled substance; the identification and location of future controlled substance transactions; the identification of controlled substance distribution methods; the identification and location of evidence of controlled substance transactions, financial records and other records

reflecting the occurrence of controlled substance transactions, and monies being used to finance and conduct the controlled substance transactions; and the identification of other individuals not yet identified who are participating in, directing, or deriving financial profit and benefit from the illegal controlled substance distribution business; and the identity of which telephone, telephones, and/or paging device or devices, if any, is or are being used by the above-named targets and other persons not yet identified, or for a period of thirty (30) days from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception pursuant to the Court's Order or ten days from the date the Order authorizing such interceptions is entered, whichever is earlier.

134. In addition, based on the information contained herein, there also is probable cause to believe that the location of Target Telephone 5 at times determined by investigators during the authorized period of interception (the "Requested Location Information") will constitute evidence of the Target Offenses and lead to the discovery of additional evidence and fruits of the crimes alleged herein. As detailed in this affidavit, physical surveillance has been difficult, and could lead to O. CRUZ discovering the presence of law enforcement, therefore altering his actions and jeopardizing the investigation.

135. Finally, IT IS FURTHER REQUESTED that this Affidavit, the attached Application, the resulting Order and Orders to the Service Provider, and all reports submitted pursuant to this Order be sealed until further Order of the Court.


Jeremiah S. Johnson
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to before me on this the 24th day of November, 2021.


Honorable Thomas A. Varlan
United States District Judge